# LINDHEIMER ET AL. *v.* ILLINOIS BELL TELE-PHONE CO.*

No. 440.  Argued January 15, 16, 1934.—Decided April 30, 1934.

---

* Together with No. 548, *Illinois Bell Telephone Co.* v. *Lindheimer et al.*

*Messrs. George I. Haight* and *Benjamin F. Goldstein,* with whom *Messrs. William H. Sexton* and *Edmund D. Adcock* were on the brief, for Lindheimer et al.

*Messrs. William H. Thompson* and *Charles M. Bracelen,* with whom *Messrs. Edward L. Blackman, Kenneth F. Burgess, Leslie N. Jones, John H. Ray,* and *John W. Davis* were on the brief, for the Illinois Bell Telephone Co.

By leave of Court, *Mr. Patrick H. O'Brien,* Attorney General of Michigan, and *Mr. Harold Goodman* filed a brief on behalf of the State of Michigan, as *amicus curiae.*

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

This case comes here for the second time. It presents the question of the validity under the Fourteenth Amendment of rates prescribed by the Illinois Commerce Commission for telephone service in the City of Chicago. The Commission's order, made on August 16, 1923, to be effective October 1, 1923, reduced rates applicable to a large part of the intrastate service of the appellee, Illinois Bell Telephone Company.[1] In this suit, brought by that Company in September, 1923, an interlocutory injunction was granted upon the condition that if the injunction were dissolved the Company should refund the amounts charged in excess of the challenged rates. We affirmed that order. 269 U.S. 531. The final hearing was not had until April, 1929,—a delay found to be attributable to the City of Chicago. On that hearing, the District Court, composed of three judges, entered a final decree making the injunction permanent. 38 F. (2d) 77. We reversed that decree and remanded the case for further proceedings. *Smith* v. *Illinois Bell Telephone Co.,* 282 U.S. 133. Further evidence was then taken and the District Court made

---

[1] The order reduced rates for four classes of coin box service. Otherwise it kept in force the rates which were fixed by an order of December 20, 1920. The coin boxes are in private residences and places of business and are not public pay stations.

new findings and entered a final decree which permanently restrained the enforcement of the Commission's order and released the Company from obligation to refund the moneys which had been collected pending the suit. 3 F.Supp. 595. The state authorities and the city bring this direct appeal. Jud. Code, § 266. The Company brings a cross-appeal to review the findings below, insisting that its property has been undervalued and that substantial amounts of its operating expenses have been disallowed.

*No. 440.—The appeal of the state officers and the City of Chicago.* On the former appeal, it appeared that no distinction had been made by the Commission or by the District Court between the intrastate and the interstate property and business of the Company. We found that separation was essential to the appropriate recognition of the competent governmental authority in each field of regulation. Accordingly, we directed that as to the value of the property employed in the intrastate business in Chicago and as to the amounts of revenue and expenses incident to that business, separately considered, there should be specific findings. And as a rate order which is confiscatory when made may cease to be confiscatory, and one which is valid when made may become confiscatory at a later period, we held that there should be appropriate findings for each of the years since the date of the Commission's order. 282 U.S. pp. 149, 162. On the further hearing, that difficult task was so well performed that no question is now raised as to the allocation of property to the intrastate and interstate services, respectively, in the Chicago area, the allocation being made on the basis of use.[2] Nor is there dispute with respect to the

---

[2] It appears that in 1923 there was used in the intrastate service approximately 95 per cent. of appellee's total property in the Chicago area. This percentage progressively decreased in the succeeding years, and in 1931 was somewhat less than 91 per cent.

156

separation of expenses. Appellants object to the separation of revenues, insisting that certain revenues were improperly assigned to the interstate, instead of the intrastate, business.[3]

Considering the fact that ninety-nine per cent. of the stock of appellee is owned by the American Telephone & Telegraph Company, which also owns substantially the same proportion of the stock of the Western Electric Company, we directed that there should be further examination of the purchases made by appellee from the Western Electric·Company and of the payments made by appellee to the American Company. As it appeared that the Western Electric Company, through the organization and control of the American Company, was virtually the manufacturing department for the Bell system, we directed specific findings to be made as to the net earnings of the Western Electric Company in that department and as to the extent to which, if at all, such profit figured in the estimates upon which the charge of confiscation was predicated. We also held that there should be specific findings with regard to the cost to the American Company of the services which it rendered to appellee and the reasonable amount which should be allocated in that respect to the operating expenses of appellee's intrastate business. *Id.*, pp. 153, 157. The District Court entered into an exhaustive examination of these questions and made detailed findings. The court found that the equipment and supplies furnished by the Western Electric Company had been sold to appellee at fair and reasonable prices, and that the earnings of the Western Electric Company on its investment allocated to the business done

---

[3] The amounts of net revenue thus involved, which appellants contend should not have been allocated (under the rates in suit) to the interstate service for the respective years, are as follows: 1923, $245,042; 1924, $262,398; 1925, $309,505; 1926, $317,915; 1927, $354,372; 1928, $427,655; 1929, $486,875; 1930, $472,469; 1931, $431,580.

with appellee, and its profits on sales, had been fair and
reasonable, with the exception of an advance in prices of
10.2 per cent. effective on November 1, 1930. That ad-
vance the court disapproved, and, in determining the
reasonable outlays to be allowed to appellee after that
date, the court made a reduction of 10 per cent. from the
prices charged by the Western Electric Company.[4]
Appellee contests this reduction, and appellants object
to the amounts allowed.

The District Court made specific findings as to the char-
acter of the services rendered by the American Company
under its license contracts with appellee and the amounts
of the cost of these services which should be allocated to
the operating expenses of the latter's intrastate business.
In the years 1923 to 1928, inclusive, when the court found
that the payments under the license contracts charged on
appellee's books exceeded the cost as thus determined and
allocated, only the cost was held to be chargeable to oper-
ating expenses, but in the years 1929 to 1931, inclusive,
when the license payments as so charged were less than
the cost, only the amount of the license payments was al-
lowed as an operating expense.[5] Appellants raise many
questions in opposition to these determinations of costs
and allocations, while appellee contends that the costs as
found were less than the true costs and that the full
amounts paid under the license contracts should have
been allowed.

---

[4] Appellee states that this effected a reduction in the operating
expenses of appellee of $67,167 for the last two months of 1930,
$332,470 for 1931, and an equal amount for 1932.

[5] The amounts of the license payments thus disallowed by the
Court, as being in excess of the cost of the service, for the years
1923 to 1928, inclusive, are as follows: 1923, $573,819; 1924,
$631,549; 1925, $531,233; 1926, $432,704; 1927, $558,011; 1928,
$31,553. The amounts by which the cost to the American Company
exceeded the license payments, for the years 1929 to 1931, are as
follows: 1929, $206,253; 1930, $327,751; 1931, $234,104.

The evidence with respect to the value of appellee's property employed in its intrastate business at Chicago is voluminous. The evidence shows the original or book cost of this property, the market value of land, and estimates of the cost of reproduction new of the other physical property constituting appellee's telephone plant. There was also evidence of the condition of the property, together with estimates of accrued depreciation. Appellants submitted no valuations since one made by the Commission in 1923,[6] but presented detailed criticisms of appellee's estimates. The District Court found that the method adopted by appellee's witness in ascertaining the cost of reproduction new was reliable and that appellee's estimates were substantially correct. The court encountered difficulties in making its valuations for the years 1931 and 1932. It took notice of the general fall in values which had accompanied the depression in business. And for that reason, the court fixed values for 1931 and 1932 which in its opinion "gave due consideration to the element of the present decline." The court found that the fair rate of depreciation to be applied to reproduction cost new was 16 per cent. for the years 1923 to 1928, inclusive, and 15 per cent. for the succeeding years; and that the amount to be added to reproduction cost new on account of going value was 8 per cent. of that cost. The court also made findings as to the appellee's working cash capital, the amounts invested in materials and supplies and in property in course of construction, and as to these three items there is no controversy.

The court's findings, for each year, of the fair value of appellee's property, used and useful in its intrastate business in the Chicago area, including working cash capital, materials and supplies, construction work in progress and going value, taking the average amount for the year, and

---

[6] See 38 F. (2d) p. 86; 282 U.S. pp. 144, 145.

the court's findings as to the original or average book cost of the same property, but without going value, are as follows:

| | Fair Value | Book Cost |
|---|---|---|
| 1923 | $124,200,000 | $95,074,135 |
| 1924 | 136,500,000 | 105,291,980 |
| 1925 | 148,500,000 | 117,730,536 |
| 1926 | 151,500,000 | 130,857,355 |
| 1927 | 167,000,000 | 146,173,197 |
| 1928 | 173,000,000 | 159,622,212 |
| 1929 | 184,000,000 | 168,988,816 |
| 1930 | 187,120,000 | 178,157,620 |
| 1931 | 179,100,000 | 181,925,963 |
| 1932 | 166,500,000 | 181,925,963 |

Appellants contend that the findings as to fair value are excessive. Appellee insists that they are too low. In particular, appellee says that the property was undervalued through excessive deductions for existing depreciation. Appellee maintains that the evidence shows a maximum depreciation of 9 per cent. for the years 1923 to 1928, and of 8 per cent. thereafter, instead of the 16 per cent. and 15 per cent. deducted by the court.

In computing the net revenue from the intrastate business in Chicago, the court made adjustments in operating expenses with respect to the payments to the Western Electric Company and the American Company, as above stated, and also reduced to some extent the annual charges for depreciation. By these adjustments, the amount of the net revenue as found by the court largely exceeded that shown by appellee's books. For example, the amount available for return in the year 1923 under the existing rates appears to have been $5,347,533 according to appellee's books, while the amount found by the court to have been available for return in that year is $6,646,183. We shall presently refer to the comparison for the other years.

The court found that, if the rates in suit had been effective, appellee's net earnings on its intrastate business

would have thereby been reduced to the extent of $1,541,-668 for 1923, and by somewhat greater amounts in later years except in 1931 and 1932. As thus estimated, the net revenue available for return from the intrastate business in Chicago under the rates in suit would have been as follows: 1923, $5,104,515; 1924, $5,932,959; 1925, $6,297,-890; 1926, $6,402,128; 1927, $6,686,503; 1928, $6,914,459; 1929, $8,939,602; 1930, $8,492,385; 1931, $8,392,555; 1932, $6,750,000.

The court found that the fair rate of return on the average fair value of the intrastate property was 7½ per cent. for each of the years 1923 to 1927, inclusive, 7 per cent. for each of the years 1928, 1929 and 1930, 6½ per cent. for 1931, and 5½ per cent. for 1932. On the basis of these findings of fact, the court concluded that the rates in suit were confiscatory at all times from the date of the Commission's order.

■ *The experience of the Company under the existing rates.* The effect of the decision below, and of the findings upon which it is based, strikingly appears if we put aside for the moment the rates in suit and consider that effect in relation to the existing rates under which the Illinois Company has conducted its business since 1920. That is, if we compare the amounts available for return— the net intrastate income in Chicago under existing rates— as shown (1) by appellee's statement from its books and (2) by the court's adjustments, with (3) the amount of the net income which, under the findings of fair value, income, expenses, and rate of return, would be necessary to avoid confiscation. The following table—with columns correspondingly designated—gives the comparison: [7]

[7] Column (1) gives the net intrastate income in Chicago as shown by the Company from its books; column (2) the amount as adjusted by the District Court; and column (3) the amount required by the court's findings.

|      | (1)          | (2)          | (3)          |
|------|--------------|--------------|--------------|
| 1923 | $5,347,533   | $6,646,183   | $9,315,000   |
| 1924 | 6,230,178    | 7,483,954    | 10,237,500   |
| 1925 | 6,650,718    | 7,880,451    | 11,137,500   |
| 1926 | 6,887,012    | 8,052,698    | 11,362,500   |
| 1927 | 6,877,089    | 8,363,580    | 12,525,000   |
| 1928 | 7,601,567    | 8,627,760    | 12,110,000   |
| 1929 | 9,490,091    | 10,679,602   | 12,880,000   |
| 1930 | 9,152,490    | 10,138,263   | 13,098,400   |
| 1931 | 8,494,616    | 9,826,299    | 11,641,500   |
| 1932 |              | 8,000,000    | 9,157,500    |

On this showing, the findings if accepted would compel the conclusion that when the Commission's order was made in 1923, not only the new rates, but the existing rates as well were grossly confiscatory; that appellee was receiving under the existing rates, according to its books, a net return of $5,347,533 when it was entitled to nearly $4,000,000 more, or $9,315,000, to prevent its property from being confiscated. The table shows a similar situation in the succeeding years. Again, the inference would be irresistible that the existing rates were confiscatory when they were prescribed by the Public Utilities Commission of Illinois (the predecessor of the present Commission) in December, 1920, to be effective January 1, 1921. In the comprehensive disclosure of appellee's financial condition there is nothing to permit an inference of any radical change which would have made rates, compensatory in 1921, confiscatory in 1923.

But, instead of challenging the existing rates as constituting an invasion of constitutional right, appellee when summoned by the Commission, in September, 1921, in the proceeding which led to the order now under review, asserted that the existing rates were just and reasonable. In its answer to the Commission, appellee alleged " that its rates and charges heretofore approved and authorized by the aforesaid order of the Public Utilities Commission

of Illinois, entered on the 20th day of December, 1920, and now in full force and effect, are just and reasonable, and that the burden of proof is upon whomsoever avers, or seeks to show, that said rates and charges are unjust or unreasonable." And when this suit was brought in September, 1923, to prevent the enforcement of the new rates, appellee did not seek to enjoin the existing rates.

The financial history of the Illinois Company repels the suggestion that during all these years it was suffering from confiscatory rates. Its capital stock rose from $9,000,000 in 1901, to $70,000,000 in 1923, $80,000,000 in 1925, $110,000,000 in 1927, $130,000,000 in 1929, and $150,-000,000 in 1930. Its funded debt, which was somewhat less than $50,000,000 in 1923, continued at about the same amount until 1930. During this period appellee paid the interest on its debt and 8 per cent. dividends on its stock. Its " fixed capital reserves," [8] which embraced the depreciation reserve presently to be mentioned, rose from $37,575,004 in 1923, to $63,966,748 in 1930, and to $69,242,667 in 1931. The Company's surplus and undivided profits over and above these capital reserves increased from $5,600,326 in 1923, to $22,907,654 in 1930, and to $23,767,381 in 1931. Its " fixed capital," that is, the book cost of " total plant and general equipment," which was $145,984,084 at the end of 1923, increased to $288,381,090 at the end of 1930, and to $291,259,580 at the end of 1931. [9] We do not lose sight of the fact that this showing embraces the entire business of the Illinois Company, both interstate and intrastate. But it appears that the intrastate investment in the Chicago area ap-

---

[8] The " fixed capital reserves " are the depreciation reserve and the reserve for amortization of intangible capital. The latter reserve ranged from $182,041.50, in the year 1923, to $274,086.36 in 1930, and to $289,018.77 in 1931.

[9] This is according to the Company's " Plant and General Equipment Accounts for the Chicago and State Areas."

proximated 60 per cent. of the entire investment of appellee in the State. The book cost of the plant in service and general equipment in intrastate business in Chicago increased from $95,582,266 at the end of 1923 to $174,-160,314 at the end of 1930, and to $177,384,652 at the end of 1931.[10] "The gross additions" to the Company's property in the Chicago area, the Company states, "were spread fairly evenly over the period."—"The business expanded with great rapidity. The number of telephones in Chicago increased from 690,000 at the end of 1923 to 940,000 at the end of 1931, and was 987,000 at the peak in 1929." During the nine years "a greater amount of plant was added new to the property than was in service at the beginning of the term." The Company informs us that the property was kept "at a high and even standard of maintenance throughout the years involved" and "was at all times capable of giving adequate telephone service abreast of the art." The property has been efficiently and economically operated and the Company has enjoyed excellent credit.

This actual experience of the Company is more convincing than tabulations of estimates. In the face of that experience, we are unable to conclude that the Company has been operating under confiscatory intrastate rates. Yet, as we have said, the conclusion that the existing rates have been confiscatory—and grossly confiscatory—would be inescapable if the findings below were accepted. In that event, the Company would not only be entitled to resist reduction through the rates in suit, but to demand, as a constitutional right, a large increase over the rates which have enabled it to operate with out-

---

[10] The book cost of the "Plant in Service and General Equipment" for the Chicago area, including both interstate and intrastate business, rose from $100,040,051 at the end of 1923 to $191,286,165 at the end of 1930 and to $195,422,113 at the end of 1931.

standing success. Elaborate calculations which are at war with realities are of no avail. The glaring incongruity between the effect of the findings below, as to the amounts of return that must be available in order to avoid confiscation, and the actual results of the Company's business, makes it impossible to accept those findings as a basis of decision.

■ *The effect of the reduction through the rates in suit.* The foregoing considerations limit our inquiry. It is not necessary to traverse the wide field of controversy to which we are invited and to review the host of contested points presented by counsel. In the view that the existing rates cannot be regarded as inadequate, the question is simply as to the effect of the reduction in net income by the rates in suit. The question is whether the Company has established, with the clarity and definiteness befitting the cause, that this reduction would bring about confiscation. *Los Angeles Gas Co.* v. *Railroad Comm'n,* 289 U.S. 287, 304, 305. The amounts of the reduction for the respective years are not in dispute.[11] It would have been $1,541,668 for 1923, would have been greatest, at $1,740,000, for 1929, and least, at $1,270,000, for 1932.

*Operating expenses.* In determining the effect of these reductions, and what amounts would still be available to the Company for net return, we come to the questions raised by the Company's charges to operating expenses. Charges to operating expenses may be as important as valuations of property. Thus, excessive charges of $1,500,000 to operating expenses would be the equivalent of 6 per cent. on $25,000,000 in a rate base. In this in-

---

[11] The amounts of the reduction in intrastate income in Chicago, if the rates in suit had been effective, as shown by the Company and found by the District Court, are as follows: 1923, $1,541,668; 1924, $1,550,995; 1925, $1,582,561; 1926, $1,650,570; 1927, $1,677,077; 1928, $1,713,301; 1929, $1,740,000; 1930, $1,645,878; 1931, $1,433,044; 1932, $1,270,000.

stance, against the reductions which the rates in suit would have effected, are the considerable sums which would be added to the amounts available for return by the adjustments in operating expenses made by the District Court.[12] These adjustments embraced overpayments found to have been made by the Illinois Company in its transactions with the American Telegraph and Telephone Company and the Western Electric Company. In 1923, the overpayment to the former Company, treating its outlay, or the cost of its service to its subsidiary, as the measure of the operating expense, was found to be $573,819; the average of the annual overpayments, as found for the years 1923 to 1927, inclusive, amounted to $545,443.[13] It should be noted that on the same basis of adjustment there would have been an increase (averaging $256,036) in operating expenses for the years 1929 to 1931, when the cost of the service exceeded the license payments.[14] The court below found overpayments to the Western Electric Company of $332,470 in 1931 and 1932, respectively.[15] There are numerous contentions presented by each of the parties in relation to these adjustments—by appellants, to decrease, and by appellee, to increase, the amounts of expense allowed—but we shall not undertake to pass upon them in view of the determinative nature, for the present purpose, of the remaining question as to the sums which the Company has annually charged to operating expenses for depreciation.

*Annual allowances for depreciation.* The Commission, in the order under review, concluded that the depreciation reserve (amounting, at the end of 1922, for the Chi-

---

[12] See comparison of the amounts of net return as shown by the Company with the amounts as adjusted by the District Court, in table, *supra,* p. 161.

[13] *Supra,* p. 157, Note 5.

[14] *Id.*

[15] *Supra,* p. 157, Note 4.

cago property, interstate and intrastate, to about $26,-000,000) had been built up by annual additions that were in excess of the amounts required. The Commission provided for "a combined maintenance and replacement allowance" which it considered sufficient to protect the investment in the property and to permit the Company "to accrue a reserve in the anticipation of property retirements." On the first hearing, the District Court considered that the effect of that ruling was to reduce the amount charged for depreciation to the operating expenses in 1923 to the extent of about $1,800,000.[16] The Company did not comply with the Commission's requirement but continued its own method of computing the annual allowances. We adverted to this question on the former appeal. We said that the recognition of the ownership of the property represented by the depreciation reserve did not justify the continuance of excessive charges to operating expenses. We thought that the experience of the Illinois Company, together with a careful analysis of the results shown under comparable conditions, by other companies which are part of the Bell system, should afford a sound basis for judgment as to the amount which in fairness both to public and private interest should be allowed as an annual charge. 282 U.S. pp. 157–159. The District Court in making its findings stated that it had considered the data to which we referred, but we are not advised as to the precise method of its calculations.[17] The annual amounts allowed by the court for depreciation, as compared with those which appellee charged on its books to operating expenses,[18] are as follows:

[16] 38 F. (2d) pp. 86, 87.

[17] 3 F. Supp. p. 605.

[18] The Company's charges on its books were based on original cost. The Company claims considerably larger amounts as the result of recomputations for each class of property according to its replacement value new.

|  | Court's Allowances | Book Charges |
|---|---|---|
| 1923 | $4,000,000 | $4,222,000 |
| 1924 | 4,250,000 | 4,470,000 |
| 1925 | 4,750,000 | 5,048,000 |
| 1926 | 5,400,000 | 5,767,000 |
| 1927 | 6,000,000 | 6,335,000 |
| 1928 | 6,650,000 | 7,009,000 |
| 1929 | 7,000,000 | 7,436,000 |
| 1930 | 7,200,000 | 7,865,000 |
| 1931 | 7,400,000 | 8,133,000 |

Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence.[19] Annual depreciation is the loss which takes place in a year. In determining reasonable rates for supplying public service, it is proper to include in the operating expenses, that is, in the cost of producing the service, an allowance for consumption of capital in order to maintain the integrity of the investment in the service rendered.[20] The amount necessary to be provided annually for this purpose is the subject of estimate and computation. In this instance, the Company has used the "straight line" method of computation, a method ap-

[19] Depreciation, as defined by the Interstate Commerce Commission, "is the loss in service value not restored by current maintenance and incurred in connection with the consumption or prospective retirement of property in the course of service from causes against which the carrier is not protected by insurance, which are known to be in current operation, and whose effect can be forecast with a reasonable approach to accuracy." 177 I.C.C. p. 422.

[20] See Knoxville v. Knoxville Water Co., 212 U.S. 1, 13, 14; Kansas City Southern Ry. Co. v. United States, 231 U.S. 423, 448; Denver v. Denver Union Water Co., 246 U.S. 178, 191; Southwestern Bell Telephone Co. v. Public Service Comm'n, 262 U.S. 276, 278; Georgia Railway & Power Co. v. Railroad Comm'n, 262 U.S. 625, 633; United Railways v. West, 280 U.S. 234, 253, 260; Smith v. Illinois Bell Telephone Co., 282 U.S. 133, 158; Clark's Ferry Bridge Co. v. Public Service Comm'n, 291 U.S. 227.

proved by the Interstate Commerce Commission. 177 I.C.C. pp. 408, 413. By this method the annual depreciation charge is obtained by dividing the estimated service value by the number of years of estimated service life. The method is designed to spread evenly over the service life of the property the loss which is realized when the property is ultimately retired from service. According to the principle of this accounting practice, the loss is computed upon the actual cost of the property as entered upon the books, less the expected salvage, and the amount charged each year is one year's pro rata share of the total amount.[21] Because of the many different classes of plant, some with long and some with short lives, some having large salvage and others little salvage or no salvage, and because of the large number of units of a class, the Company employs averages, that is, average service life, average salvage of poles, of telephones, etc.

While property remains in the plant, the estimated depreciation rate is applied to the book cost and the resulting amounts are charged currently as expenses of operation. The same amounts are credited to the account for depreciation reserve, the " Reserve for Accrued Depreciation." When property is retired, its cost is taken out of the capital accounts, and its cost, less salvage, is taken out of the depreciation reserve account. According to the practice of the Company, the depreciation reserve is not held as a separate fund but is invested in plant and equipment. As the allowances for depreciation, credited to the depreciation reserve account, are charged to operating expenses, the depreciation reserve invested in the property thus represents, at a given time, the amount of the investment which has been made out of the proceeds of telephone rates for the ostensible purpose of replacing capital consumed. If the predictions of service life were entirely accurate and retirements were made when and as these predictions were

---

[21] See 177 I.C.C. pp. 431, *et seq.*

precisely fulfilled, the depreciation reserve would represent the consumption of capital, on a cost basis, according to the method which spreads that loss over the respective service periods. But if the amounts charged to operating expenses and credited to the account for depreciation reserve are excessive, to that extent subscribers for the telephone service are required to provide, in effect, capital contributions, not to make good losses incurred by the utility in the service rendered and thus to keep its investment unimpaired, but to secure additional plant and equipment upon which the utility expects a return.

Confiscation being the issue, the Company has the burden of making a convincing showing that the amounts it has charged to operating expenses for depreciation have not been excessive. That burden is not sustained by proof that its general accounting system has been correct. The calculations are mathematical but the predictions underlying them are essentially matters of opinion.[22] They proceed from studies of the "behavior of large groups" of items. These studies are beset with a host of perplexing problems. Their determination involves the examination of many variable elements, and oppor-

---

[22] In the exposition in evidence, to which the Company's counsel refer in their argument, of the "Straight Line Depreciation Practice" of the companies in the Bell system, it is said: "The proper interpretation of the data regarding plant life and salvage obtainable from accounts, records and statistics is of equal importance with the integrity of the data themselves. It would seem that we should have first: investigations of past service life and salvage through sound accounting and statistical methods; second: investigations of the conditions surrounding the employment of such plant in the past and of the extent to which such conditions still prevail; third: the best possible forecast of conditions looming in the future which should exert a modifying influence upon either life or salvage. And then, the active judgment which fuses the experience of the past, so far as it is still pertinent, and the expectation for the future, so far as it is presently pertinent, into a just and reasonable determination of the current rate of depreciation for the time being."

tunities for excessive allowances, even under a correct system of accounting, are always present. The necessity of checking the results is not questioned. The predictions must meet the controlling test of experience.

In this instance, the evidence of expert computations of the amounts required for annual allowances does not stand alone. In striking contrast is the proof of the actual condition of the plant as maintained—proof which the Company strongly emphasizes as complete and indisputable in its sharp criticism of the amount of accrued depreciation found by the District Court in valuing the property. The Company insists that " the existing depreciation in the property, physical and functional, does not exceed 9 per cent. in the years 1923 to 1928 and 8 per cent. thereafter." The existing depreciation as thus asserted by the Company, and the amounts it shows as the depreciation reserve allocated to the intrastate business in Chicago (taking in each case the average amounts per year) are as follows:

| Years. | Existing depreciation. | Depreciation reserve.[23] |
|---|---|---|
| 1923 | $11,992,000 | $26,797,000 |
| 1924 | 12,865,000 | 29,316,000 |
| 1925 | 13,775,000 | 32,155,000 |
| 1926 | 14,621,000 | 35,572,000 |
| 1927 | 15,360,000 | 39,352,000 |
| 1928 | 16,241,000 | 42,769,000 |
| 1929 | 15,300,000 | 44,515,000 |
| 1930 | 15,863,000 | 45,829,000 |
| 1931 | 15,828,000 | 48,362,000 |

In explanation of this large difference, the Company urges that the depreciation reserve in a given year does

[23] The Company obtains these average amounts from the total Chicago depreciation reserve at the end of each year, multiplied by the percentage found to be applicable to the intrastate business, with a deduction of one-half of the increase during the year in order to obtain the average. The balance in the depreciation reserve for the entire Chicago property, interstate and intrastate, increased from $4,384,828 at the end of 1911 to $29,306,122 at the end of 1923.

not purport to measure the actual depreciation at that time; that there is no regularity in the development of depreciation; that it does not proceed in accordance with any fixed rule; that as to a very large part of the property there is no way of predicting the extent to which there will be impairment in a particular year. Many different causes operating differently at different times with respect to different sorts of property produce the ultimate loss against which protection is sought. As the accruals to the depreciation reserve are the result of calculations which are designed evenly to distribute the loss over estimated service life, the accounting reserve will ordinarily be in excess of the actual depreciation. Further, there are the special conditions of a growing plant,— "there are new plant groups in operation on which depreciation is accruing but which are not yet represented, or are but slightly represented, in the retirement losses." Where, as in this instance, there has been a rapid growth, retirements at one point of time will relate for the most part to the smaller preceding plant, while the depreciation reserve account is currently building up to meet the "increased eventual retirement liability" of the enlarged plant.

Giving full weight to these considerations, we are not persuaded that they are adequate to explain the great disparity which the evidence reveals. As the Company's counsel say: " The reserve balance and the actual depreciation at any time can be compared only after examining the property to ascertain its condition; the depreciation, physical and functional, thus found can be measured in dollars and the amount compared with the reserve." Here, we are dealing not simply with a particular year but with a period of many years—a fairly long range of experience—and with careful and detailed examinations made both at the beginning and near the end of that period. The showing of the condition of the property, and

of the way in which it has been maintained, puts the matter in a strong light. In substance, the Company tells us: The property in Chicago is a modern Bell system plant. Through the process of current maintenance, worn, damaged or otherwise defective parts were being constantly removed before their impairment affected the telephone service. The factors of "inadequacy" and "obsolescence" were continuously anticipated by the Company, so that the telephone service might not be impaired, "and no depreciation of that character was ever present in the plant, except to the slight extent that obsolete items of plant were found" as stated by the Company's witnesses. One of these witnesses testified that, in his examination of the plant to determine existing depreciation, he understood "that anything that was obsolete or inadequate was to be depreciated accordingly." We are told by the Company that in that investigation— "Condition new was assumed to be free from defects or impairment of any kind, that is, perfect or 100% condition, and the thing as it stood in actual use in the plant was compared with the same thing new." "All existing depreciation, both physical and functional, was reduced to a percentage, and subtracted from 100 per cent." The service measured up to the standards of the telephone art at all times. The plant capable of giving such service "was not functionally deficient, in any practical sense. This is not to say that parts of the plant did not from time to time become inadequate or obsolete, but that the Company continuously anticipates and forestalls inadequacy and obsolescence. Before a thing becomes inadequate or obsolete it is removed from the plant." But little variation was found in the percentage of existing depreciation during the years 1923 to 1931.[24]   The Com-

---

[24] Referring to the period 1923 to 1931, and to the Company's exhibit, the Company's counsel state—that "the percentage of depreciation in the various classes of plant did not vary materially

pany points out that the Commission found, in its order of 1923, that the property was then " in at least 90 per cent. condition." " The weighted total or overall condition," the Company shows, " is 91 per cent. for the years 1923–1928 and 92 per cent. for subsequent years."

This condition, kept at a nearly constant level, directs attention to the amounts expended for current maintenance. In the process of current maintenance, "new parts" are "installed to replace old parts" in units of property not retired. Such "substitutions or 'repairs' " are separate from the amounts which figure in the depreciation reserve. The distinction between expenses for current maintenance and depreciation is theoretically clear. Depreciation is defined as the expense occasioned by the using up of physical property employed as fixed capital; current maintenance, as the expense occasioned in keeping the physical property in the condition required for continued use during its service life. But it is evident that the distinction is a difficult one to observe in practice with scientific precision, and that outlays for maintenance charged to current expenses may involve many substitutions of new for old parts which tend to keep down the

during the period, with the exception of three classes, namely, central office equipment, private branch exchanges and booths and special fittings. In the case of central office equipment, there were large installations of new equipment in 1929 which had the effect of raising the per cent. condition for the entire class from 92 per cent. for prior years to 93 per cent. for 1929 and subsequent years. In the case of private branch exchanges, the percentage condition improved gradually from 88 per cent. in 1923 to 94 per cent. in 1930 due to the large proportion of new installations and correspondingly large retirements of the old. In the case of booths and special fittings, the percentage condition gradually improved from 78 per cent. in 1923 to 85 per cent. at the end of the period, in this case also because of abnormally large changes of booths at pay stations. These are the changes which in the main account for the fact that the overall condition of the plant rose from 91 per cent. for the years 1923–1928 to 92 per cent. thereafter."

accrued depreciation.    The amounts charged by the Company to current maintenance year by year, the amounts credited to the depreciation reserve, and the total of the two sets of charges to operating expenses for the intrastate property in Chicago are as follows:

|  | Current maintenance. | Depreciation. | Total. |
|---|---|---|---|
| 1923 | $5,643,623 | $4,222,000 | $9,865,623 |
| 1924 | 6,043,737 | 4,470,000 | 10,513,737 |
| 1925 | 6,563,193 | 5,048,000 | 11,611,193 |
| 1926 | 7,714,364 | 5,767,000 | 13,481,364 |
| 1927 | 8,849,550 | 6,335,000 | 15,184,550 |
| 1928 | 9,941,143 | 7,009,000 | 16,950,143 |
| 1929 | 10,671,576 | 7,436,000 | 18,107,576 |
| 1930 | 11,372,858 | 7,865,000 | 19,237,858 |
| 1931 | 10,842,053 | 8,133,000 | 18,975,053 |

These aggregate amounts range from over 30 per cent. to nearly 40 per cent. of the total amounts charged by the Company to operating expenses.[25]

In the light of the evidence as to the expenditures for current maintenance and the proved condition of the property—in the face of the disparity between the actual extent of depreciation, as ascertained according to the comprehensive standards used by the Company's witnesses, and the amount of the depreciation reserve—it cannot be said that the Company has established that the reserve merely represents the consumption of capital in the service rendered.    Rather it appears that the depreciation reserve to a large extent represents provision for capital additions, over and above the amount required to cover capital consumption.    This excess in the balance of the reserve account has been built up by excessive

---

[25] The total amounts charged by the Company for operating expenses in the intrastate business at Chicago appear to be as follows: 1923, $31,550,286; 1924, $33,275,574; 1925, $35,649,160; 1926, $38,893,042; 1927, $42,142,649; 1928, $45,704,899; 1929, $48,489,647; 1930, $49,319,993; 1931, $47,904,196.

annual allowances for depreciation charged to operating expenses.

In answer to appellants' criticism, the Company suggests that an adjustment might be made by giving credit in favor of the telephone users " in an amount equal to $3\frac{1}{2}$ per cent. upon the difference between the depreciation reserve and the amount deducted from the valuation for existing depreciation." The suggestion is beside the point. The point is as to the necessity for the annual charges for depreciation, as made or claimed by the Company, in order to avoid confiscation through the rates in suit. On that point the Company has the burden of proof. We find that this burden has not been sustained. Nor is the result changed by figuring the allowances at the somewhat reduced amounts fixed by the court below.[26]

We find this point to be a critical one. The questionable amounts annually charged to operating expenses for depreciation are large enough to destroy any basis for holding that it has been convincingly shown that the reduction in income through the rates in suit would produce confiscation.

The case has long been pending and should be brought to an end. The Company has had abundant opportunity to establish its contentions. In seeking to do so, the Company has submitted elaborate estimates and computations, but these have overshot the mark. Proving too much, they fail of the intended effect. It is not the function of the court to attempt to construct out of this voluminous record independent calculations to invalidate the challenged rates. It is enough that the rates have been established by competent authority and that their invalidity has not been satisfactorily proved.

The decree below is reversed and the cause is remanded with direction to dissolve the interlocutory injunction, to

[26] See, *supra*, p. 167.

provide for the refunding, in accordance with the terms of that injunction and of the bonds given pursuant thereto, of the amounts charged by the Company in excess of the rates in suit, and to dismiss the bill of complaint.

*No. 548.—The appeal of the Company.* The Company was successful in the District Court and has no right of appeal from the decree in its favor. The Company is not entitled to prosecute such an appeal for the purpose of procuring a review of the findings of the court below with respect to the value of the Company's property or the other findings of which it complains. Its contentions in these respects have been considered in connection with the appeal of the state authorities and the city. The appeal of the Company is dismissed. *New York Telephone Co.* v. *Maltbie,* 291 U.S. 645.

*Decree in No. 440 reversed.*
*Appeal in No. 548 dismissed.*

Mr. Justice Butler, concurring.

The evidence does not show that the amounts taken by the company from revenue and charged to the depreciation reserve were required for the maintenance of the property or that the amounts allowed by the lower court for that purpose were needed. The ruling in condemnation of the charges to the depreciation reserve is so important that, even at the risk of duplication, emphasis should be laid upon some facts and reasons that may be cited in its support.

The court's opinion discloses the principle followed for the ascertainment of the amounts annually so charged. It is the straight line method calculated on cost less salvage.[1] That method was prescribed by the Interstate

---

[1] This is not in harmony with the principle of our decision in *United Railways* v. *West,* 280 U.S. 234, 253–254, which requires replacement cost to be taken as the basis of calculation.

Commerce Commission by an order effective January 1, 1913, establishing the uniform system of accounts for telephone companies.[2] The evidence requires a finding that the company faithfully followed the prescribed system. The state commission continuously watched over the

[2] The following is § 23, Uniform System of Accounts for Telephone Companies, promulgated by the Interstate Commerce Commission, effective January 1, 1913. It will serve to disclose the underlying principle on which the reserve charges are made.

"Depreciation of Plant and Equipment.—Telephone companies should include in operating expenses depreciation charges for the purpose of creating proper and adequate reserves to cover the expenses of depreciation currently accruing in the tangible fixed capital. By *expense of depreciation* is meant—

(a) The losses suffered through the current lessening in value of tangible property from wear and tear (not covered by current repairs).

(b) Obsolescence or inadequacy resulting from age, physical change, or supersession by reason of new inventions and discoveries, changes in popular demand, or public requirements, and

(c) Losses suffered through destruction of property by extraordinary casualties.

The amount charged as expense of depreciation should be based upon rules determined by the accounting company. Such rules may be derived from a consideration of the company's history and experience. Companies should be prepared to furnish the Commission, upon demand, the rules and a sworn statement of the facts, expert opinions, and estimates upon which they are based.

The estimate for depreciation of physical property should take into account—

(a) The gradual deterioration and ultimate retirement of units of property which may be satisfactorily individualized, such as buildings, machines, valuable instruments, etc., to the end that by the time such units of property go out of service there shall have been accumulated a reserve equal to the original money cost of such property plus expenses incident to retirement less the value of any salvage.

(b) The depreciation accruing in property which cannot be readily individualized, such as pole lines, wires, cables, or other continuous structures, where expenditures for repairs or replacements of individual parts ordinarily are not actually made until the

company's handling of the depreciation reserve account.

The table next below shows by years in column (1) the intrastate reserve balances, in (2) the intrastate book cost of the property and in (3) percentages that the balances are of the cost.

TABLE I.

| | (1) | (2) | (3) |
|---|---|---|---|
| 1923 | $26,797,000 | $95,074,135 | 28.1% |
| 1924 | 29,316,000 | 105,291,980 | 27.8 |
| 1925 | 32,155,000 | 117,730,536 | 27.3 |
| 1926 | 35,572,000 | 130,857,355 | 27.1 |
| 1927 | 39,352,000 | 146,173,197 | 26.9 |
| 1928 | 42,769,000 | 159,622,212 | 26.7 |
| 1929 | 44,515,000 | 168,988,816 | 26.2 |
| 1930 | 45,829,000 | 178,157,620 | 25.9 |
| 1931 | 48,362,000 | 181,925,963 | 26. |

The cost of the property includes from $2,000,000 to $3,000,000 paid for land which is not depreciable, and $13,000,000 to $18,000,000 paid for buildings having a long service life. There are other important and relatively permanent plant elements. These facts suggest that the percentages shown in the table are considerably lower than the actual relation of reserve balances to cost of depreciable parts of the property. While much of the plant is new, the reserve was piled up at about the rate that the cost of plant increased. The balances held in respect of all property, interstate and intrastate, increased from about $4,000,000 in 1911 to about $26,000,-

later years of the life in service of such property, and when made may, therefore, be classed as extraordinary repairs.

The rate of depreciation should be fixed so as to distribute, as nearly as may be, evenly throughout the life of the depreciating property the burden of repairs and the cost of capital consumed in operations during a given month or year, and should be based upon the average life of the units comprised in the respective classes of property, . . ,"

000 in 1922. The amounts attributable to the intrastate property alone show an average annual increase of more than $2,300,000. That amount is greatly in excess of the reduction of revenue that would have resulted if the rate order had been enforced.

The table below shows by years in column (1) the amounts actually expended for current maintenance, in column (2) the amounts charged to depreciation reserve, in column (3) the total of both.

TABLE II.

|  | (1) | (2) | (3) |
|---|---|---|---|
| 1923 | $5,643,623 | $4,222,000 | $9,865,623 |
| 1924 | 6,043,737 | 4,470,000 | 10,513,737 |
| 1925 | 6,563,193 | 5,048,000 | 11,611,193 |
| 1926 | 7,714,364 | 5,767,000 | 13,481,364 |
| 1927 | 8,849,550 | 6,335,000 | 15,184,550 |
| 1928 | 9,941,143 | 7,009,000 | 16,950,143 |
| 1929 | 10,671,526 | 7,436,000 | 18,107,526 |
| 1930 | 11,372,858 | 7,865,000 | 19,237,858 |
| 1931 | 10,842,053 | 8,133,000 | 18,975,053 |

The importance of the amounts involved is illustrated by the following table which shows by years (1) expenditures for current maintenance plus charges to depreciation reserve, in (2) revenues, in (3) the percentages that the former are of the latter.

TABLE III.

|  | (1) | (2) | (3) |
|---|---|---|---|
| 1923 | $9,865,623 | $37,146,181 | 26.5% |
| 1924 | 10,513,737 | 39,353,954 | 26.5 |
| 1925 | 11,611,193 | 42,560,451 | 27.2 |
| 1926 | 13,481,364 | 45,932,698 | 29.3 |
| 1927 | 15,184,550 | 49,163,580 | 30.8 |
| 1928 | 16,950,143 | 53,677,760 | 31.5 |
| 1929 | 18,107,526 | 58,279,602 | 31 |
| 1930 | 19,237,858 | 58,698,263 | 32.7 |
| 1931 | 18,975,053 | 56,496,299 | 33.5 |

The next table gives similar information. It shows by years in column (1) actual expenditures for maintenance plus charges to the reserve, in (2) the total of all operating expenses and in (3) the percentages that the former are of the latter.

TABLE IV.

| | (1) | (2) | (3) |
|---|---|---|---|
| 1923 | $9,865,623 | $31,550,286 | 31.2% |
| 1924 | 10,513,737 | 33,275,574 | 31.5 |
| 1925 | 11,611,193 | 35,649,160 | 32.5 |
| 1926 | 13,481,364 | 38,893,042 | 34.6 |
| 1927 | 15,184,550 | 42,142,649 | 36 |
| 1928 | 16,950,143 | 45,704,899 | 37 |
| 1929 | 18,107,526 | 48,489,647 | 39.4 |
| 1930 | 19,237,858 | 49,319,993 | 39 |
| 1931 | 18,975,053 | 47,904,196 | 39.5 |

The actual annual expenditures to keep the plant in proper condition for service are made up of the amounts included in current maintenance and those taken from the depreciation reserve. The table next below is illustrative and is intended to show by years in column (1) that total, in column (2) the revenue, in (3) the percentage that the former is of the latter.

TABLE V.

| | (1) | (2) | (3) |
|---|---|---|---|
| 1924 | $7,994,737 | $39,653,954 | 20.1% |
| 1925 | 8,772,193 | 42,560,451 | 20.6 |
| 1926 | 10,064,364 | 45,163,580 | 21.8 |
| 1927 | 11,404,550 | 49,163,580 | 23.1 |
| 1928 | 13,533,143 | 53,677,760 | 25.2 |
| 1929 | 16,361,526 | 58,279,602 | 28 |
| 1930 | 17,923,858 | 58,698,263 | 30.5 |
| 1931 | 16,442,053 | 56,496,299 | 29.1 |

The purpose of this table is to compare the percentage in each year with the percentage in each of the other years. It is to be observed that the lowest is 20.1% (1924) and the highest 30.5% (1930). This comparison

serves to test the claim that the depreciation reserve is needed in order to equalize annual cost of upkeep in relation to revenue. If the period covered is typical, the last statement strongly suggests that no reserve account is necessary for that purpose. And that impression is confirmed by a similar comparison of the percentages in Table IV. It shows the relation of current maintenance plus depreciation reserve charges to revenue. Comparing the percentage in each year (during the period covered by Table V) with the percentage in each of the other years, the lowest is 31.5% (1924), the highest is 39.5 (1931). .

From the foregoing it justly may be inferred that charges made according to the principle followed by the company create reserves much in excess of what is needed for maintenance. The balances carried by the company include large amounts that never can be used for the purposes for which the reserve was created. In the long run the amounts thus unnecessarily taken from revenue will reach about one-half the total cost of all depreciable parts of the plant. The only legitimate purpose of the reserve is to equalize expenditures for maintenance so as to take from the revenue earned in each year its fair . share of the burden. To the extent that the annual charges include amounts that will not be required for that purpose, the account misrepresents the cost of the service.

The company's properties constitute a complex and highly developed instrumentality containing many classes of items that require renewal from time to time. But, taken as a whole, the plant must be deemed to be permanent. It never was intended to be new in all its parts. It would be impossible to make it so. Expenditures in an attempt to accomplish that would be wasteful. Amounts sufficient to create a reserve balance that is the same percentage of total cost of depreciable items as their age is of their total service life cannot be accepted as legitimate

additions to operating expenses. In the absence of proof definitely establishing what annual deductions from revenues were necessary for adequate maintenance of the property, the company is not entitled to have the rate order set aside as confiscatory.