### HOBOKEN MANUFACTURERS' R. CO. v. UNITED STATES et al.

Civ. No. 1100.

District Court, D. New Jersey.
Nov. 24, 1942.

John Drewen, of Jersey City, N. J., for plaintiff.

E. M. Reidy, Asst. Chief Counsel, of Washington, D. C., Collins & Corbin, of Jersey City, N. J., and Frank Coleman, Sp. Asst. to the Atty. Gen., for the United States.

Before BIGGS, Circuit Judge, and FAKE and SMITH, District Judges.

BIGGS, Circuit Judge.

The plaintiff, Hoboken Manufacturers' Railroad Company (referred to hereafter as Hoboken), in the case at bar seeks to set aside an order of the Interstate Commerce Commission, dated July 24, 1939, finding, after full hearing, that the divisions received by Hoboken out of joint class and commodity rates on traffic interchanged by it with Seatrain Lines, Inc., were not unjust or inequitable.

The plaintiff is a short switching railroad which runs along the waterfront of Hoboken, New Jersey. It connects with the Erie Railroad and through the Erie with other trunk line railroads. It exchanges freight and cars with those railroads. The Hoboken Railroad also serves industries and steamship piers along the Hoboken waterfront and, in particular, the pier of Seatrain Lines, Inc.

The defendant is the United States of America. The Interstate Commerce Commission was made a defendant, pursuant to the provisions of Sections 212 and 213 of the Judicial Code, as amended, 38 ·Stat. 220, 28 U.S.C.A. § 45a. Many of the eastern trunk line carriers intervened, and the argument for these carriers has been made by the Baltimore & Ohio Railroad Company.

■ This court has jurisdiction, pursuant to the provisions of the Acts of June 18, 1910 and October 22, 1913, the Commerce Act and the Urgent Deficiencies Act, as set forth in 38 Stat. 219, 28 U.S.

C.A. § 41(28) and 38 Stat. 219, 220, 28 U.S.C.A. §§ 43–48, inclusive. The suit at bar was brought to review a decision and order of the Commission dismissing a complaint brought by Hoboken, to secure a determination by the Commission of the just, reasonable, and equitable divisions of the joint through rates on lighterage-free freight interchanged by Hoboken with Seatrain Lines, Inc.

Seatrain Lines, Inc. (hereafter referred to as "Seatrain") operates three ships. These are fast four-decked vessels, carrying standard gauge railroad tracks. Two of the vessels can carry one hundred freight cars each and the third ninety-five cars. The vessels operate between Hoboken, New Jersey and Belle Chasse in Louisiana, via Havana, Cuba. When a Seatrain ship is put in position at its dock, it is next to a "cradle" which, by means of a large overhead crane, lifts the loaded freight car from the dock and carries it through one of a number of large hatches on the ship to one of the tracks within the vessel. The tracks of the cradle fit the tracks on ship, and the car is then pushed off the cradle to its place on the ship by a special little engine. There is one cradle for each track on each deck of the vessel and, when the loading of each deck is accomplished, the cradles are left in place flush with the deck, each cradle closing a hatch. In taking the car from ship to shore the process is reversed. By the use of the Seatrain method, goods and merchandise may be transported from shore to ship and from ship to shore without breaking bulk, and the necessity of loading and unloading the freight is eliminated.

This method of interchange is used between Seatrain and Hoboken. Approximately 40% of the cars interchanged by Hoboken with Seatrain move under lighterage-free rates, and about 60% under non-lighterage-free rates. With Seatrain freight regardless of how it is billed, whether as lighterage-free freight or non-lighterage-free freight, it is handled by Hoboken in precisely the same physical fashion.

When freight is shipped on lighterage-free rates, the carrier undertakes to deliver the freight at the foot of ship's tackle without any charge for lighterage.[1] The

[1] Lighterage has been defined as loading, unloading, or transportation by means of a lighter. The word came into use at a time when docking facilities frequently were insufficient to accommodate large ships which therefore stood out in the harbor. Merchandise was carried to them by smaller vessels or lighters.

term lighterage is used to describe all those steps taken to deliver freight from a railroad car to a point where the ship's tackle may lift it to the ship. Lighterage, therefore, is the loading, unloading, and transfer of freight between a car and a ship's side. In the case at bar we are concerned only with the lighterage-free rate, and how it shall be divided between Hoboken and the trunk line carriers.

The Commission has established a through-rate of $7 per ton, to shipside. On break-bulk lighterage-free freight the trunk lines receive for their share $5.65, and Hoboken receives $1.35. Of this $1.35, 60¢ goes to Hoboken as compensation for switching charges and 75¢ goes to it as reimbursement for the cost of loading, unloading, and transferring freight between the freight cars and shipside. On Seatrain freight, using that phrase to describe freight contained in cars lifted on the cradle to or from the Seatrain ship and in which the bulk is not broken, of the $7 through-rate to shipside, the trunk lines have refused to allot to Hoboken more than the sum of 60¢ for its switching charges, retaining the 75¢, which was saved due to elimination of loading and unloading charges. Hoboken claims that upon Seatrain freight the trunk lines should receive $5.65 as their share and Hoboken should receive 60¢ for switching as usual, and 75¢ to reimburse it for payments made to Seatrain for the right to use the special Seatrain labor-saving and time-saving facilities. Hoboken contends that, while it may not be entitled to the full sum of 75¢ in this connection, it is entitled to some part of the 75¢ for the facilities which it has made available which permit shipping by sea without breaking bulk.[2]

The contentions of Hoboken must be examined in the light of the corporate relations existing between Seatrain and Hoboken. Prior to 1932, Seatrain had begun negotiations with Hoboken for the use of the terminal facilities. Seatrain then learned that Hoboken was insolvent and bought up all of its stock at auction. Seatrain now owns all of the 4000 shares with the exception of five qualifying directors' shares. Six of Hoboken's seven directors are also directors of Seatrain. Four of Hoboken's eight officers are officers of Seatrain.

Graham M. Brush, the president of Seatrain and of Hoboken, is the inventor of the Seatrain ship and of the appliances for loading and unloading freight cars into and out of such ships. He assigned his patents to Railway Transports, Inc., a corporation in which he is one of 700 shareholders. The extent of his control of this corporation was not disclosed. Railway Transports, Inc., gave Seatrain an exclusive license under the patents, for which Seatrain pays as royalty the sum of approximately $50,000 per annum. The patents expire in 1944.

[2] We have used these break-down figures on the $7 through-rate because the parties really have argued their case upon this basis. There have been some slight changes in the break-down figures, but these are small. We think that if we employed the changed figures in this opinion confusion might result. We will refer to them briefly in this note.

The divisional allowance to Hoboken, prior to March 28, 1938, the effective date of the decision of the Commission in Ex Parte 123, Fifteen Percent Case 1937–1938, 226 I.C.C. 41, was $1.35 per ton, which amount represented 60¢ for switching and 75¢ for loading or unloading the cars. The $1.35 division was increased under Ex Parte 123, either 5 or 10%, depending upon the commodities transported. See pages 37–39, testimony before the Commission, and Exhibit 2.

On car-load shipments loaded or unloaded by the shipper or consignee at their expense, the divisional allowance to Hoboken prior to Ex Parte 123, was 60¢ per ton, and subsequent to Ex Parte 123, either 63¢ or 66¢ per ton. See the same pages and the same Exhibit.

No loading or unloading of Seatrain freight being necessary to place or receive it at shipside, the trunk line railroads paid Hoboken on such freight a divisional allowance of 60¢ a ton prior to March 28, 1938, and 63¢ or 66¢ a ton after that date.

The 63¢ or 66¢ allowances (See Exhibit 36) represent an increase of 215 and 230% respectively over the 20¢ per ton allowance in effect prior to July 1, 1918. If Hoboken's original divisional allowance of 20¢ had been increased in accordance with the general rate increases and reductions authorized by the Commission, its present allowances would be 38, 40 or 42¢, varying as to commodities and territorial application of the rates. Prior to Ex Parte 123 a compromise settlement was reached with the trunk line, establishing Hoboken's division at 60¢ per ton.

Hoboken and Seatrain entered into a contract dated November 21, 1932 (subsequent to the purchase of Hoboken's stock by Seatrain, although negotiations had been commenced prior to the purchase) which provided, in respect to freight transported by Hoboken and consigned for delivery to Seatrain, that delivery should be considered to be completed by Hoboken when the cars had been placed upon the cradle. Under the contract Seatrain had the right, upon its request, to have Hoboken place the cars at some convenient point near the cradle, and Seatrain itself was then to place the cars on the cradle as Hoboken's agent. By other provisions of the contract Hoboken authorized Seatrain, as its agent, to take the cars from the cradle. The contract provided also that Hoboken would pay Seatrain 40¢ per ton of freight (other than coal) loaded into, or discharged from, the Seatrain ships in cars.

By a later contract between Hoboken and Seatrain, dated February 24, 1937, effective as of March 1, 1937, it was provided that Hoboken would pay Seatrain 73¢ per ton (subject to possible revisions because of increases or decreases in the scale of longshoremen's wages) on all freight interchanged between them shipped on lighterage-free rates, and that Hoboken would pay Seatrain nothing on freight shipped on non-lighterage-free rates. Under this contract, Seatrain does not move the cars to or from the cradle. This service is performed by Hoboken.

The justification asserted by Hoboken for the sums paid by it to Seatrain is that, as the Seatrain appliances make it unnecessary to load or unload freight, the trunk line railroads are relieved of the expense of 75¢ per ton for which they ordinarily reimburse Hoboken when freight is moved under lighterage-free rates to or from water carriers other than Seatrain. Hoboken claims that since the trunk line carriers get these advantages by reason of Hoboken's contract with Seatrain, the savings effected should accrue to Hoboken and not to the trunk line carriers.

Under the contract of 1937, Seatrain charges Hoboken 73¢ for the Seatrain devices when used on lighterage-free freight. This would leave Hoboken 2¢ out of the 75¢, which Hoboken alleges it should receive under a new division of the $7 through-rate. If Hoboken's contentions were to prevail, it would be able to operate at a profit. Otherwise, Hoboken will operate (as it has in the past) at a loss. The Commission indicated, however, that if Hoboken had not made the 73¢ payment it would have operated at a profit, averaging the years 1936 and 1937.

Part of the Commission's report is devoted to a discussion of the various elements which compose Hoboken's necessary operating expenses and its income. Seatrain leases the Seatrain pier and slip from Hoboken. The rental is based on Hoboken's expenditures. These include rent, taxes, insurance, depreciation, repairs, maintenance and dredging, plus an estimated return of 6% on Hoboken's investment in the property. The crane which handles the cradles also is leased by Seatrain from Hoboken. Its original cost was about $85,000. The rental for all of the foregoing for the year beginning March 1, 1937, the effective date of the later contract, was about $33,000.

It appears from the Commission's report that Hoboken paid Seatrain $110,000 in 1936, pursuant to the provisions of the 1932 contract; that in 1937 Hoboken paid Seatrain approximately $100,000. The cars that moved between Hoboken and Seatrain under lighterage-free rates were about 50% of all the cars moving between Seatrain and Hoboken. It follows that Hoboken paid Seatrain nothing for about 50% of the cars, viz., those that moved under non-lighterage-free rates.

The Commission concludes that the record before it warrants the finding that the former division of 60¢ and the present divisions of 63¢ and 66¢ a ton on lighterage-free freight are sufficient to cover the cost of the services performed by Hoboken and also constitutes a reasonable return on the property owned or used by Hoboken in performing such service. The Commission goes on to say, and we think correctly, that the service that the railroads hold themselves out to perform under the lighterage-free rates includes the unloading of inbound cars and the placing of the lading within reach of the ship's tackle and a corresponding but reverse service in connection with outbound freight. Placing the cars upon the cradle or removing them therefrom satisfies all those requirements.

■ The Commission dismissed the complaint holding that the 75¢ charge was not

properly a transportation charge and that it could not be justified as a legitimate factor contributing to the efficiency of Hoboken's operation.[3]

Hoboken has appealed to this court alleging that the order of the Commission was based upon errors in law in disregarding the contract between Hoboken and Seatrain, that the findings of the Commission are not supported by evidence, and that the order results in a confiscation of Hoboken's property without due process of law.

■ We have jurisdiction to review the order of the Commission. The Commission's determinations upon matters of fact are binding, but the court may set aside the order if the *parties were not accorded a fair and complete hearing, or if the findings of the Commission are not supported by evidence, or if the rate established by the Commission results in a deprivation of property without due process of law. Interstate Commerce Commission v. Union Pacific R. R. Co., 222 U.S. 541, 547, 32 S. Ct. 108, 56 L.Ed. 308; Florida East Coast Ry. Co. v. United States, 234 U.S. 167, 34 S.Ct. 867, 58 L.Ed. 1267; St. Joseph Stockyards Co. v. United States, 298 U.S. 38, 51, 56 S.Ct. 720, 80 L.Ed. 1033.[4] There is here no contention that the proceedings before the Commission were not fair and adequate in every way.

■ Admittedly the Commission as the trier of fact must determine the point at which the transportation service of the railroad is completed and, if the Commission's finding in this respect is supported by substantial evidence, the parties and this court are bound upon it. The question of where transportation by rail ends is an administrative question. Atchison, T. & S. F. Ry. v. United States, 295 U.S. 193, 201, 55 S.Ct. 748, 79 L.Ed. 1382; United States v. American Sheet & Tin Plate Company, 301 U.S. 402, 57 S.Ct. 804, 81 L.Ed. 1186; United States v. Pan American Petroleum Corporation, 304 U.S. 156, 58 S.Ct. 771, 82 L.Ed. 1262. Even though we might reach a different conclusion, if there is evidence to support the Commission's findings, its order must be sustained. New England Divisions Case, 261 U.S. 184, 204, 43 S.Ct. 270, 67 L.Ed. 605; Seaboard Airline Ry. Co. v. United States, 254 U.S. 57, 62, 41 S.Ct. 24, 65 L.Ed. 129. The finding by the Commission that rail transportation ends at the cradle when Hoboken has put the car consigned for Seatrain upon it and begins at the cradle when the movement is reversed is fully supported by the evidence. The contract of November 21, 1932, between Hoboken and Seatrain expressly so provided, and the contract of February 24, 1937, now in force between Hoboken and Seatrain, makes no substantial change in this respect although Hoboken makes Seatrain its agent to put the cars upon and take them off the cradle. Since, as the Commission determined, transportation ends at the cradle, Hoboken completes its obligation under the lighterage-free tariff when it delivers the cars to the cradle. The Commission, therefore, held that the payments by Hoboken to Seatrain do not constitute a legitimate transportation cost. Upon this finding, supported by evidence, its judgment is final. United States v. Pan American Petroleum Corporation, 304 U.S. 156, 58 S.Ct. 771, 82 L.Ed. 1262.

In its report the Commission found that, "While, therefore, the payments are not made for any service which the rail lines perform under the lighterage-free rate, there is a remaining question whether such payments may be justified, in any way and to any extent as compensation properly payable to Seatrain for the savings which it has accomplished for the rail lines by its new method of transfer. The new method of transfer puts the connecting rail lines to less expense under the lighterage-free rates than the old method. It may be argued, therefore, that they would be justified in making any payments that might be necessary for the purpose of inducing the establishment of the new method of transfer provided they were left with a net saving. There is no evidence, however, that payments were or are necessary

---

[3] That the Commission dismissed the complaint instead of entering a positive order is immaterial. The effect of the action is to establish the current practice as the approved division. Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147; Alton R. Co. v. United States, 287 U.S. 229, 53 S.Ct. 124, 77 L.Ed. 275;

Baltimore & O. R. Co. v. United States, 298 U.S. 349, 358, 56 S.Ct. 797, 80 L.Ed. 1209.

[4] But see the concurring opinion of Mr. Justice Brandeis asserting the finality of administrative findings notwithstanding questions of constitutionality. 298 U. S. 38, 73, 56 S.Ct. 720, 735, 80 L.Ed. 1033, 1052.

for this purpose. The contract between Seatrain and complainant, to which defendant rail lines are not parties, is not evidence to this effect, in view of the control which Seatrain exercises over complainant. No such payments have, so far as the record shows, been exacted or obtained by Seatrain from an independent rail connection. There is ample reason to conclude, also, that the improved method of transfer is only an incident to the Seatrain plan of transportation, and that this plan has sufficient advantages to impel its use and promotion by Seatrain regardless of any contributory payments from rail connections."

■■ Admittedly the contract between Seatrain and Hoboken should be examined carefully because of the corporate relationship. Lindheimer v. Illinois Telephone Co., 292 U.S. 151, 156, 54 S.Ct. 658, 78 L.Ed. 1182; Pittsburgh & W. V. Ry. Co. v. United States, D.C., 41 F.2d 806, 811. Also, Seatrain does not exact payments from the railroads with which it interconnects at Havana and New Orleans. Hoboken asserts, however, that if Seatrain were to demand such payments from the United Railways of Havana, the latter's revenue from traffic with Seatrain would be less than that received from its traffic with break-bulk carriers. The location of the terminal at Belle Chasse saves Seatrain approximately 17 miles of travel in each direction and this, according to Hoboken, is sufficient to compensate for the lack of contributory payments. The Commission did not determine the validity of the contract, but dismissed the entire question of the contract payments on the theory that Hoboken would receive the same interconnecting facilities irrespective of the payments.

However, the issue at bar is not predicated solely upon Hoboken's legitimate costs. The entire inquiry should be directed to securing "a fair and equitable division" of the rates. Conceding arguendo that the contract between Hoboken and Seatrain does not constitute a valid obligation to be considered in determining Hoboken's costs, that does not necessarily mean that there is no obligation upon Hoboken to make some payment for the interconnection which saves Hoboken the labor and costs of loading and unloading freight. The Commission should have determined the quantum meruit of the relationship. It is possible that there was no service or relationship of value. Even such a finding would not necessarily result in a dismissal of the complaint. If there is a windfall in the case at bar by reason of Hoboken's right under its contract to use the Seatrain devices to fulfill its obligations of carriage, the Commission should determine that fact and also an equitable basis for division of the windfall between Hoboken and the trunk line carriers. This the Commission has failed to do by appropriate findings.

■ Whereas the burden of proof in attacking an established rate rests upon the complainant, Interstate Commerce Commission v. Nashville, C. & St. L. Ry. Co., 5 Cir., 120 F. 934, the instant case was brought to determine a new division since previous agreements did not cover the novel facts of the Seatrain method of interchange. The agreement which Hoboken had had with the trunk line carriers since 1920 provides that the divisions shall be as follows:

"Carloads loaded or unloaded by HMRR (Hoboken) or at its expense $1.35 per ton

"Carloads loaded or unloaded by shipper or consignee at their expense $ .60 per ton"[6]

These rates are by their own terms inapplicable to the Seatrain method of interchange in which the loading and unloading is eliminated.

■ The Act directs the Commission to inquire into the facts and to prescribe just and equitable divisions and not unjustly to prefer or prejudice any party. There was no evidence presented to show that the granting of the entire saving of the loading or unloading of the cars was not an undue emolument for the trunk line railroads. The Commission's remark that the defendant's rates were based on average costs scarcely constitutes a finding as prescribed by the Act. The Commission merely stated in conclusion that such divisions are not unduly preferential. Where there is a lack of basic findings, the court need not examine the

---

[6] Pursuant to Ex Parte 123, these divisions have been increased slightly. However, these figures were used by the parties and, for convenience, we have followed their practice.

evidence and spell out conclusions of fact. State of Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291. Likewise, where the evidence does not support the findings, the holding of the Commission should not be sustained. State of Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878; New England Divisions Case, 261 U.S. 184, 204, 43 S.Ct. 270, 67 L.Ed. 605. Our holding on this point obviates the necessity for inquiring into the due process issue raised by the plaintiff.

If the Commission should find that the Seatrain devices are an efficient aid to railroad transportation, the Commission should evaluate the worth of the devices to Hoboken and a legitimate payment therefor; in short, including in the base upon which Hoboken's fair return is calculated, the true value of the Seatrain devices. In effect, the Commission, as a representative of the public interest and the public, would set the value of the contract and the Seatrain devices to Hoboken. It should likewise determine a division of the through rate which would not be unduly prejudicial or preferential to any of the parties.

The order of the Commission of July 24, 1939 will be set aside and the Commission is directed to reinstate the proceedings before it and to make findings of fact as indicated by this opinion and to issue and enter a report in the proceedings and to make such an order or orders therein as may be required by law.

Findings of fact and conclusions of law are filed herein in accordance with the provisions of Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.