932 F.2d 1
 289 U.S.App.D.C. 348
 SHOWTIME NETWORKS INC., et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
GE American Communications, Inc., Intervenor.
CHRISTIAN BROADCASTING NETWORK, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
GE American Communications, Inc., Intervenor.
NEW HERITAGE ACQUISITION CORP., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
GE American Communications, Inc., Intervenor.
GE AMERICAN COMMUNICATIONS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Southern Satellite Systems, Inc. and New Heritage
Acquisition Corp., Intervenors.
GE AMERICAN COMMUNICATIONS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Showtime Networks Inc. and New Heritage Acquisition Corp.,
Intervenors.
SHOWTIME NETWORKS INC. and Viacom International Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
GE American Communications, Inc., the Christian Broadcasting
Network, Inc. and New Heritage Acquisition Corp.,
Intervenors.
VIACOM INTERNATIONAL INC. and Showtime Networks Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
GE American Communications, Inc., Intervenor.
 Nos. 87-1259, 87-1270, 87-1274, 87-1279, 88-1353, 89-1627
and 89-1745.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 19, 1991.
Decided May 3, 1991.
 
 Petition for Review of Orders of the Federal Communications commission.
 George H. Shapiro, with whom Marilyn D. Sonn, Washington, D.C., was on the brief, for Showtime Networks Inc. and Viacom Intern. Inc., petitioners in Nos. 87-1259, 89-1627 and 89-1745, and intervenor in No. 88-1353. Gerald E. Oberst, Jr., Washington, D.C., also entered an appearance for Showtime Networks Inc.
 Peter A. Rohrbach, Washington, D.C., for GE American Communications, Inc., petitioner in Nos. 88-1279 and 88-1353, and intervenor in Nos. 87-1259, 87-1270, 87-1274, 89-1627 and 89-1745. Jay E. Ricks, Washington, D.C., also entered an appearance.
 Laurel R. Bergold, Attorney, F.C.C., with whom Robert L. Pettit, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, John E. Ingle, Deputy Associate Gen. Counsel, and Jane E. Mago, Asst. Gen. Counsel, F.C.C., and James F. Rill, Asst. Atty. Gen., Robert B. Nicholson and David Seidman, Washington, D.C., Attys., Dept. of Justice, were on the brief, for respondents in all cases. Linda L. Oliver, Washington, D.C., Atty., F.C.C., also entered an appearance for respondents.
 Grover C. Cooper and Clifford M. Harrington, Washington, D.C., entered appearances for Christian Broadcasting Network, Inc., petitioner in No. 87-1270, and intervenor in No. 89-1267.
 Ashton R. Hardy, New Orleans, La., entered an appearance for New Heritage Acquisition Corp., petitioner in No. 87-1274, and intervenor in Nos. 88-1279, 88-1353 and 89-1627.
 Robert F. Corazzini, Washington, D.C., entered an appearance for intervenor, Southern Satellite Systems, Inc., in No. 88-1279.
 Before WALD, RUTH BADER GINSBURG and THOMAS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.
 RUTH BADER GINSBURG, Circuit Judge:
 
 
 1
 In 1978, when video transmission by satellite was new, RCA American Communications, Inc. ("Americom")[1] offered to subscribers a ten-year satellite service ("1988 fixed-term service"), with lower rates in the early years of the term, and higher rates in later years. Petitioners in five of the seven cases consolidated in this review proceeding are several cable programmers who subscribed to Americom's 1988 fixed-term service.[2] They challenge rulings by the Federal Communications Commission ("Commission" or "FCC") that approved rate increases, commencing in 1981, for Americom's service.[3] We uphold the Commission's orders.
 
 I. Background
 
 2
 Cable programming in 1978 was transmitted principally by terrestrial means. Americom filed with the Commission that year a tariff offering a ten-year schedule of rates and service conditions "designed to permit the entry of customers into the satellite services market at an economical price." RCA American Communications, Inc., 69 F.C.C.2d 426, 430 (1978).
 
 
 3
 In 1980, less than two years into the ten-year term, Americom filed a new tariff with the FCC, increasing rates by about 15 percent and altering some of the structural conditions of the service. On the cable programmers' complaint, the Commission initially investigated the structural changes. At the conclusion of that investigation, the FCC rejected those changes. The Commission stated that it had measured the structural changes against a "substantial cause" standard and found that Americom had not demonstrated the requisite cause. Without separately examining the rate increases, the FCC found them "inextricably linked" to the structural changes; the Commission therefore disapproved the entire tariff. See RCA American Communications, Inc., 86 F.C.C.2d 1197, 1206 (1981) ("1981 Order").
 
 
 4
 On Americom's petition for review, this court approved in principle the Commission's substantial cause test. See RCA American Communications, Inc. v. FCC, mem. op., D.C.Cir. No. 81-1558 (July 21, 1982) [684 F.2d 1033 (table) ]. We specifically endorsed a double-faceted FCC check on changes in a long-term service. The Commission, we agreed, could look at the subscriber's side as well as the carrier's; the carrier thus could be required to show both that increased costs justified the increased rates, and that customers, who may have relied on the original tariff, would not be unduly burdened by the higher rates. But we cautioned that the "substantial cause" test should be contained within the framework of the statutory "just and reasonable" charges standard, 47 U.S.C. Sec. 201(b), and should not amount to an additional hurdle the carrier had to clear. We remanded so that the Commission could clarify whether it had indeed employed "substantial cause" only as "an aid in ascertaining whether newly-filed modifications to [Americom's] long-term service tariffs are within the zone of reasonableness." RCA American Communications, Inc. v. FCC, mem. op. at 5, D.C.Cir. No. 81-1558 (July 21, 1982). Upon the FCC's assurance that "substantial cause" was a gloss on the "just and reasonable" standard set by statute, not an additional hurdle, see RCA American Communications, Inc., 94 F.C.C.2d 1338, 1340 (1983), we affirmed the Commission's 1981 Order disapproving Americom's 1980 filing. See RCA American Communications, Inc. v. FCC, mem. op., D.C.Cir. No. 81-1558 (Mar. 8, 1984) [731 F.2d 996 (table) ].
 
 
 5
 The day after the FCC issued its 1981 Order, Americom filed a new tariff stripped of the structural changes proposed in 1980, but renewing the same rate increases. Eventually, in 1987, the Commission made its primary ruling on Americom's increased rates. RCA American Communications, Inc., 2 FCC Rcd 2363 (1987) ("1987 Order"). Events unforeseen in 1978, the FCC held, provided the requisite cause for the higher rates: the rate of inflation between 1978 and 1981 had been much higher than expected; Americom had lost a satellite (SATCOM F-3) that had been projected to replace its existing equipment; and Americom's cost of launching additional satellites had soared because the space shuttle schedule had been delayed. Americom's costs of operation and cost of capital had correspondingly mounted. Id. at 2367-68.
 
 
 6
 Of the ten issues the FCC's staff had set for investigation, the Commission's 1987 order resolved in Americom's favor all but one. That one concerned a portion ($20.8 million) of the insurance proceeds covering the loss of SATCOM F-3. Ruling that the proceeds in question should have been credited to the 1988 fixed-term customers, the Commission reserved decision on whether a refund, or a rate adjustment, was in order. See 2 FCC Rcd at 2370-71. Two years later, in 1989, the Commission held that Americom need not pay refunds or adjust its rates because, even counting the insurance proceeds as revenue to Americom, Americom had earned less than its authorized rate of return. See RCA Communications, Inc., 4 FCC Rcd 6598, 6598-99 (1989) ("1989 Order").
 
 II. Americom's Petition
 
 7
 We take up first a petition for review filed by Americom "out of an abundance of caution." Brief of Petitioner GE American Communications, Inc. at 350. Although the Commission concluded that Americom's 1981 rate increases were lawful, the FCC ruled against Americom on two intermediate issues: (1) Americom resisted the application of a "substantial cause" test to its rate increases; (2) Americom maintained that the Commission should not have considered the launch insurance proceeds for SATCOM F-3 in evaluating the reasonableness of Americom's rate increases.
 
 
 8
 We note, initially, our grave reservations whether Americom properly cast itself as a petitioner in this review proceeding. It is the general rule that a party may not appeal from a disposition in its favor. See Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 176, 54 S.Ct. 658, 668, 78 L.Ed. 1182 (1934); In re Reporters Comm. for Freedom of the Press, 773 F.2d 1325, 1328 (D.C.Cir.1985). Exceptions to this main rule have been made in circumstances not comparable to those presented here. See Deposit Guaranty Nat'l Bank v. Roper, 445 U.S. 326, 336, 100 S.Ct. 1166, 1173, 63 L.Ed.2d 427 (1980) (permitting named plaintiffs to appeal denial of class action certification, in view of prospect of spreading litigation costs among larger group, even though defendants had tendered full payment of their claims); Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939) (allowing successful defendants in patent infringement suit to appeal from declaration that the patent, though not infringed, was valid);[4] International Bhd. of Elec. Workers v. ICC, 862 F.2d 330, 334 (D.C.Cir.1988) (allowing union to challenge by appeal ICC's authority to review arbitration awards, even though ICC had upheld such an award in union's favor).
 
 
 9
 Americom, beyond question, properly appeared as intervenor urging rejection of the cable programmers' petitions for review. In that role, Americom could have urged, alternately, that correction of Commission errors in rulings adverse to Americom attend any remand. See Jecker v. Montgomery, 54 U.S. (13 How.) 498, 517, 14 L.Ed. 240 (1852) (dismissing separate appeal of party who prevailed below because "question of law decided against him ... was open for argument upon the appeal of the [adverse party]"); cf. Telecommunications Research & Action Center v. FCC, 917 F.2d 585, 588 (D.C.Cir.1990) (dismissing for lack of standing petition for review by party who endorsed the end result reached by the FCC, but disagreed with the rationale employed by the Commission).
 
 
 10
 We recognize, in short, that Americom would have followed long-established practice had it simply raised as intervenor, alternately and defensively, the issues it sought to present as petitioner. We do not reach those issues, however, because Americom itself calls them "moot" should we deny the cable programmers' review petitions. See Brief of Petitioner GE American Communications, Inc. at 350. We therefore proceed to the cable programmers' petitions and explain why we affirm the orders on review.
 
 III. The Cable Programmers' Petitions
 
 11
 In its 1989 Order, the Commission concluded that "in view of all the circumstances, the record does not warrant ordering Americom to give refunds to its 1988 Fixed Term Transponder customers." 4 FCC Rcd at 6599. That judgment stemmed from the Commission's earlier recognition, see 1987 Order, 2 FCC Rcd at 2368, that Americom reasonably targeted a 15 percent rate of return. In reality, however, it appears that Americom's actual return never approached 15 percent for any year during the relevant period, 1980-1986. See Joint Appendix ("J.A.") at 349, 854. Nor have the cable programmers disputed Americom's claim that, after the loss of SATCOM F-3 in 1979, the value of 1988 fixed-term service far exceeded Americom's tariffed rates even with the increases. See J.A. at 335-37; Brief of Intervenor GE American Communications, Inc. at 354. These characteristics of the case weigh heavily in our determination that the FCC's orders should not be disturbed. Keeping in mind these marked features, we consider the particular challenges presented by the cable programmers.
 
 A. The Substantial Cause Test
 
 12
 The cable programmers charge that the FCC merely articulated, but did not genuinely apply the "substantial cause" test when it ruled on Americom's rate increases. Looking to the carrier's side of the test, the programmers fault the Commission for failing to quantify the impact of the unforeseen events (steep inflation, loss of SATCOM F-3, and space shuttle launch schedule delays) on the cost of providing service to the 1988 fixed-term customers.[5] Although the Commission did not endeavor to detail the precise effects of events that would obviously tend to increase Americom's costs, it generally credited Americom's submissions[6] and found them, in the main, sufficient to justify the rate increases. Even with the rate increases, the FCC constantly emphasized, Americom's rate of return remained "substantially below" its target figure. See 1987 Order, 2 FCC Rcd at 2368.
 
 
 13
 The cable programmers stress that the FCC's 1981 Order rejecting Americom's entire tariff, in contrast to the Commission's 1987 order on rates, required a particularized showing, not merely a "generalized assertion," of a connection between rising costs and a proposed change. See Brief for Petitioners Showtime et al. at 24. But the language from the 1981 Order highlighted by the programmers concerned the connection between rising costs and a structural change in the tariff, one that would have prohibited Americom's customers from cancelling service. There was not a plain and certain link, the Commission indicated, between rising costs and Americom's proffered structural changes. There is, however, an altogether evident connection between rising costs and the need for more revenue.
 
 
 14
 Concerning the burden on customers, the FCC emphasized that, offsetting the rate increase, Americom had eliminated the subscriber's liability for early termination of service. Thus, customers could switch to another provider if a more favorable opportunity were available. Americom pointed out that despite new competition, both from other satellites and from new fiber optic technologies, see J.A. at 312-15, and despite elimination of liability for termination of service, its customers largely remained Americom subscribers.[7] Nor did the cable programmers identify any alternative, cheaper transmission service that they might have used instead of Americom's 1988 fixed-term service, had they known that Americom would increase its rates.
 
 
 15
 In essence, the cable programmers would like the court to direct the Commission to apply the "substantial cause" test to rate increases in a more muscular way.[8] We have no warrant on this record to so instruct the Commission. We recall, in this regard, our own direction to the FCC to use the test as "an aid in ascertaining whether newly-filed modifications to [Americom's] long-term service tariffs are within the zone of reasonableness," and not "as an additional hurdle that [Americom's] otherwise reasonable new tariff ha[s] to overcome." RCA Communications, Inc. v. FCC, mem. op. at 352, D.C.Cir. No. 81-1558 (July 21, 1982). The FCC's application of the "substantial cause" test is consistent with the "limited role" we marked out for that test. RCA American Communications, Inc. v. FCC, mem. op. at 350, D.C.Cir. No. 81-1558 (Mar. 8, 1984).[9]
 
 B. "Used and Useful" Challenges
 
 16
 The programmers argue, further, that the FCC departed from established Commission precedent when it permitted Americom to include in its rate base the construction costs of satellites launched more than twelve months after Americom filed its 1981 tariff. We note at the outset that the Commission enjoys broad discretion in deciding whether to include "plant under construction" ("PUC") in the current rate base. "[S]uch inter-temporal distributional decisions are for the agency to make," we have held, "and so long as it shows that it knows what it is doing, and gives a rational reason for doing it, we will not interfere with the result." Illinois Bell Tel. Co. v. FCC, 911 F.2d 776, 782 (D.C.Cir.1990). We have further "recognized that any of a large number of rate base theories are acceptable, and require[ ] only that the chosen theory be consistently applied, and result in a reasonable rate of return." Communications Satellite Corp. v. FCC, 611 F.2d 883, 890-91 (D.C.Cir.1977). With these principles in full view, we turn to the cable programmers' two particular challenges.
 
 
 17
 First, the programmers renew their contention that two of Americom's satellites--SATCOM I-R and II-R, both scheduled for launch in 1983--were, from the start, dedicated to services other than cable programming, and therefore were not useful to the programmers. Furthermore, they assert, Americom later expressly limited access to SATCOM IV by 1988 fixed-term customers and sold space on its ground spare satellite "on a non-common carrier basis." Accordingly, the cable programmers maintain, the Commission should have required Americom to exclude altogether the construction costs of SATCOM I-R and II-R from the rate base, and it should have required Americom to allocate the costs of the other two satellites (SATCOM IV and the ground spare) "among the discrete services that used them." Brief for Petitioners Showtime et al. at 34 & n. 46.
 
 
 18
 Americom, in contrast, described its satellites as fungible. Each was capable of carrying all of the various types of "C-band" transponder service. Americom therefore tariffed its C-band services on a system-wide rather than a satellite-specific basis.[10] The Commission recognized that Americom "has the right to move its customers to another satellite if it sees fit," 1987 Order, 2 FCC Rcd at 2368, and it further accepted Americom's contention that the four satellites "benefit[ ] all users of [Americom's] satellite system by providing redundant and replacement capacity." Id. at 2369. Accordingly, the Commission concluded, Americom's "system-wide" method of rate-base calculation was appropriate, and Americom had properly included the costs of the four newer satellites in the rate base for the cable programmers' service. Recalling our prior rulings that "the widest latitude is to be permitted public regulatory commissions in their determination of a rate base," Communications Satellite Corp., 611 F.2d at 890, we cannot say that either the Commission's resolution of the conflict between the programmers' and Americom's claims as to the satellites' usefulness, or the FCC's ultimate conclusion as to the propriety of rate-base treatment, is unreasonable.[11]
 
 
 19
 The programmers contend, alternately, that even if it was proper to include, after launch, the costs of the four satellites on which the programmers did not ordinarily receive service, the FCC erred in giving these satellites rate-base treatment as of 1981. The Commission, they argue, should have required Americom to defer inclusion until the satellites were fully operational--in 1983, for SATCOM I-R and II-R, and 1984, for the ground spare. According to the cable programmers, the Commission "has traditionally disallowed inclusion of long-term PUC in regulated rate bases," Brief for Petitioners Showtime et al. at 28; in the present case, according to the programmers,, the Commission departed from that policy without explanation.
 
 
 20
 The FCC correctly observes, however, that the programmers too readily identify the "used and useful" principle with exclusion of PUC. As the programmers admit, the Commission has not always required the investment to be "used and useful" immediately; rather, it has "allow[ed] carriers to include in their rate bases ... property that is 'used and useful' in providing service to ratepayers either presently or within a reasonable period of time." Id. at 28 (emphasis added); see also American Tel. & Tel. Co., Phase II Final Decision & Order, 64 F.C.C.2d 1, 47 (1977) (same). And "[t]he question of what length of time constitutes 'the near future' has no strict, economically sound answer. It is thus subject to Commission judgment and discretion, and depends upon the particular circumstances of each case." Id. In determining what constitutes a "reasonable period of time," the Commission has explained, it is guided by the principle that ratepayers must not be "forced to pay a return on investment which may not be used for a considerable length of time or is not needed to serve as a reserve for currently used investment." Id. (emphasis added).
 
 
 21
 In the present case, the Commission found that the four newer satellites were useful to Americom's subscribers, even before launch, as ground spares that "assure[d] system reliability" and "provide[d] redundant or replacement capacity in the event of a malfunction of on-line equipment." 1987 Order, 2 FCC Rcd at 2369. Given this finding, the Commission rationally could rank their construction costs as property "needed to serve as a reserve for currently used investment."
 
 
 22
 The FCC's resolution of this issue is consistent with its ultimate disposition of the Comsat litigation--apparently the only other Commission case raising PUC rate-base issues in the satellite context. In that case, the FCC approved as "just and reasonable" a settlement agreement that allowed the carrier to include satellite construction costs in the current rate base. See Communications Satellite Corp., 68 F.C.C.2d 941, 948-49 (1978). The Commission noted that, compared with terrestrial facilities, satellites have much shorter useful lives and thus require more frequent replacement. Accordingly, the Commission reasoned, satellite construction is "necessary just to maintain current levels of service for existing customers." Id. at 949. The Commission has found that the four newer satellites performed the same function in the present case.[12] The FCC's approval of PUC inclusion, we therefore conclude, is both reasonable and consistent with Commission precedent.
 
 
 23
 C. Treatment of the SATCOM F-3 Insurance Proceeds
 
 
 24
 After the 1979 loss of SATCOM F-3, Americom received insurance proceeds covering both the asset value of the satellite and lost revenues. Americom paid the $20.8 million proceeds representing lost revenues to its corporate parent, then RCA. The Commission found in its 1987 Order that Americom's subscribers, not its corporate parent, had paid the premiums on the SATCOM F-3 insurance policy; it concluded, therefore, that "Americom should credit its 1988 fixed term transponder service customers in some manner for some portion of the insurance proceeds of SATCOM F-3." 2 FCC Rcd at 2370. The Commission requested supplemental briefing on the issue of how the customers should be credited. Id. at 2370-71.
 
 
 25
 In its 1989 Order, the FCC credited the $20.8 million to Americom's customers as revenue received from them over SATCOM F-3's projected useful life. The Commission reasoned that because Americom had never attained its authorized rate of return during that period, it would not order Americom to pay refunds to its customers or otherwise adjust its rates. See 4 FCC Rcd at 6598-99.
 
 
 26
 The cable programmers argue that the Commission's decision not to order refunds amounts to a retroactive rate increase. We reject this argument, for the simple reason that the Commission's order is not a rate increase, nor even its "functional equivalent." Reply Brief for Petitioners Showtime et al. at 15. Rather, the Commission simply refused to require Americom to reduce the programmers' rates, because, as it reasonably found, even when the $20.8 million was credited as revenue received, Americom had earned far less than its authorized rate of return.[13]
 
 D. Other Issues
 
 27
 The cable programmers additionally urge that the Commission failed to address adequately a host of other issues. The programmers' main brief spotlights three: (1) Americom's use of a 30 percent debt/70 percent equity ratio in calculating its rate of return; (2) Americom's alleged change in its cost methodology; and (3) Americom's inclusion in its rate base of an inflated number of transponders. We are satisfied that the cable programmers' objections on these points do not warrant unsettling the Commission's orders.
 
 
 28
 Concerning the debt/equity ratio, it is not genuinely disputed that, since 1975, Americom consistently used 30/70 for purposes of its rate filings. See J.A. at 351, 527-28. Because the 1981 tariff made no change in this regard, the substantial cause standard is not even arguably implicated in the FCC's acceptance of Americom's use of the 30/70 ratio. Moreover, as Americom noted, Americom is a wholly-owned subsidiary, hence its "balance sheet is managed to achieve corporate-wide objectives and changes frequently as funds flow between the parent and subsidiary." J.A. at 710 n. 2. Americom's actual debt/equity figure is thus somewhat artificial.
 
 
 29
 The cable programmers pointed to evidence in the record showing that, at one point in time, 1981, Americom's actual ratio was 39/61. The Commission properly demurred. Use of the 39/61 ratio would have decreased Americom's permissible rate of return from 15 percent to 14.5 percent, but the record demonstrated that Americom's achieved rate of return was significantly lower than 14.5 percent throughout the relevant period. In sum, we cannot reject as arbitrary the FCC's acceptance of the 30/70 figure as within the "zone of reasonableness."
 
 
 30
 Americom, in its 1981 filing, used a "first cost less accumulated depreciation" method to calculate its investment in the satellite facilities. Before the Commission, the cable programmers unsuccessfully challenged that method as inappropriate. In this court, the programmers do not assail the chosen method per se, but assert that Americom had used a different method, an "average net investment" method, in previous filings and had shown no substantial cause for switching.
 
 
 31
 The Commission's 1987 Order appeared to hold that Americom had not changed its accounting methods with its 1981 filing. See 1987 Order, 2 FCC Rcd at 2368. In its current brief, however, the FCC tells us it "never determined that the methodology used by Americom [in 1981] was the same methodology that had been used in previous filings." Brief for Respondents at 45. It simply determined that the method Americom chose and employed was reasonable. Essentially, the Commission again demurred to the cable programmers' plea, resting on these determinations: (1) Americom had substantial cause, based on large and unanticipated cost increases, to change material provisions of its tariff, i.e., its rates; (2) Americom's "first cost" accounting method choice was reasonable, i.e., consistent with accepted practices; and (3) the end result was reasonable. Substantial cause, the Commission noted, applies to "material provisions" of a tariff, not to auxiliary matters such as changes in a carrier's cost methodology. For such matters, the FCC maintains, the reasonableness standard suffices.
 
 
 32
 The Commission's opinion that Americom's 1981 use of a "first cost" method was reasonable, and not subject to a substantial cause test, survives our review. In applying the more stringent test only to "material provisions" of a tariff, the FCC is proceeding in accord with this court's understanding of the "limited role" properly assigned to the substantial-cause-for-change criterion. RCA American Communications, Inc. v. FCC, mem. op. at 3, D.C.Cir. No. 81-1558 (Mar. 8, 1984).
 
 
 33
 To the cable programmers' charge that Americom had included in its rate base an inflated number of protection transponders, the Commission recounted that it had authorized Americom to construct as a ground spare a satellite Americom had originally proposed as an in-orbit spare. There was thus no change in the number of transponders. In their Reply Brief, the cable programmers first announced that, in their opening brief, they had miscast the matter of the protection transponders as a rate-base issue. Reply Brief for Petitioners Showtime et al. at 18. They then presented, in light of their "[f]urther review of the record," id., further argument. The Commission adequately answered the programmers' opening argument. We end the matter there and rule out of order the recasted reply. See, e.g., McBride v. Merrell Dow & Pharmaceuticals, Inc., 800 F.2d 1208, 1210-11 (D.C.Cir.1986); Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275, 284 n. 32 (D.C.Cir.1981).
 
 CONCLUSION
 
 34
 For the reasons stated in Part II of this opinion, we dismiss Americom's petition for review. Because the Commission has reasonably resolved each of the issues raised by the cable programmers, their petitions for review are
 
 
 35
 Denied.
 
 
 
 [1]
 Since the filing date of the tariff transmittals in question, Americom's name has been changed to GE American Communications, Inc. as a result of the acquisition of Americom's parent company by General Electric Co
 
 
 [2]
 These petitioners are: Showtime Networks Inc.; Viacom International Inc.; The Christian Broadcasting Network, Inc.; and New Heritage Acquisition Corp. Americom filed contingent petitions in the other two cases. See infra pp. 351-352
 
 
 [3]
 The rulings under review are: RCA American Communications, Inc., 2 FCC Rcd 2363 (1987); RCA American Communications, Inc., 3 FCC Rcd 1184 (1988); RCA American Communications, Inc., 4 FCC Rcd 6598 (1989); and Viacom International Inc. v. RCA American Communications, Inc., 4 FCC Rcd 8212 (1989)
 
 
 [4]
 Cf. Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 1117, 87 L.Ed. 1450 (1943) ("To hold a patent valid if it is not infringed is to decide a hypothetical case.") (discussing Electrical Fittings Corp.)
 
 
 [5]
 The programmers are incorrect in asserting that the Commission neglected to mention Americom's higher-than-expected revenues. See 1987 Order, 2 FCC Rcd at 2365
 
 
 [6]
 Americom explained, for example, that inflation and space shuttle delays increased its launch expenses by 83 percent and the cost of satellites by 135 percent. See Joint Appendix (J.A.) at 283. Americom also showed that the loss of SATCOM F-3 caused launch insurance to nearly double. See J.A. at 307; see also J.A. at 350-56 (loss of satellite, combined with higher-than-expected rate of inflation, justified increasing authorized rate of return from 12 percent to 15 percent)
 
 
 [7]
 The record indicates that several of Americom's fixed-term customers did switch to other carriers. See J.A. at 315 n. 56
 
 
 [8]
 The programmers cite as illustrative a recent decision of the Commission's Common Carrier Bureau, AT & T Communications, DA 90-1545, 5 FCC Rcd 6777 (1990). Even if an inconsistency exists, however, a point we do not decide, the Commission has no obligation to conform its decisions to subsequent rulings of its staff. See Amor Family Broadcasting Group v. FCC, 918 F.2d 960, 962 (D.C.Cir.1990)
 
 
 [9]
 The cable programmers assume that the Commission was obliged to apply the "substantial cause" standard discretely to each of the ten issues the FCC's staff set for investigation, not just in determining whether Americom's rate increase was justified. The standard, however, is not so specifically and repetitiously pinpointed as the programmers suggest. It applies only to "material provisions" of a tariff, see 1981 Order, 86 F.C.C.2d at 1201, not to every issue related to rate calculations
 
 
 [10]
 While it did group the cable programmers together on two of its satellites, Americom stated that it was prepared, both technically and legally, to shift the cable programmers to other satellites should their service be interrupted by satellite failure, or should the Commission so order. See J.A. at 699-700
 
 
 [11]
 The programmers argue that the Commission did not find that the other satellites are useful to them. They rely heavily on the following passage from the 1987 Order:
 We cannot accept Showtime's assertion that it is impossible that 1988 fixed term transponder service customers will be able to use the facilities under construction. Technological improvements in earth stations allowing them to see a larger segment of the orbital arc, repair of facilities in space and other technological advances may make these facilities available to customers who would not be able to use them at present.
 1987 Order, 2 FCC Rcd at 2369. If this passage were taken in isolation, the programmers would be right that the FCC did not find the other satellites to be useful to them. In context, however, we take the FCC to be adding that, not only are the other satellites currently useful as backup capacity, but that they may also be useful for the programmers' day-to-day operations in the future, when technological advances make it more feasible to shift signals quickly from one satellite to another. We do not rely upon this latter speculation.
 
 
 [12]
 The cable programmers seek to distinguish the Comsat case, noting that the Commission initially approved immediate inclusion only of interest accrued during construction, and required Comsat to defer recovery of the construction costs themselves. See 56 F.C.C.2d 1101, 1132-36 (1975). The programmers note also that this court approved the Commission's decision in this regard. See Communications Satellite Corp., 611 F.2d at 895. The programmers overlook, however, the fact that the permissibility of one method of rate-base calculation does not mean that the Commission's choice of another method is impermissible. See id. at 890 ("any of a large number of rate base theories are acceptable")
 
 
 [13]
 Because we have concluded that Americom's treatment of the insurance proceeds did not constitute a rate increase, we need not consider the cable programmers' argument that Americom was obliged to "demonstrate substantial cause for increasing its rates in the amount of the insurance proceeds." Brief for Petitioners Showtime et al. at 42. And because we agree with the Commission that Americom's "system-wide" accounting practices are reasonable, see supra p. 354, we reject the programmers' contention that Americom was required to allocate the insurance proceeds only to 1988 fixed-term customers