Davis v. Metropolitan Life Ins. Co.   CV-03-463-JD  09/13/04

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


H. Joel Davis

        v.                              Civil No. 03-463-JD
                                        Opinion No. 2004 DNH 132
Metropolitan Life
Insurance Company


O R D E R


Metropolitan Life Insurance Company and UNUM Life Insurance Company has moved for summary judgment on state law claims by their insured, H. Joel Davis, on the ground that they are pre-empted by ERISA.  Davis objects.


Background

Davis provides graphic design and related services through Advantage Promotions, Inc., a New Hampshire corporation owned entirely by him and his wife.  Davis and his wife serve as the company's vice president and president, respectively.  Advantage has one other employee, an office manager named Karen Fidler.  Advantage provides health insurance to Davis, his wife, and Fidler through Blue Cross and Blue Shield.

With the assistance of Andrew Rocco, an insurance agent, Davis executed a pre-printed application form for disability insurance with New England Mutual Life Insurance Company on March

6, 1995.[1]  Davis sought disability insurance on the advice of his accountant, who expressed concern that Davis would not be able to provide for his family if an injury prevented him from working. Rocco attests that he advised Davis to purchase an individual disability policy and that they never discussed any employee welfare benefit plan.

Davis checked the box for "No" in response to a question on the application, "Will this case be part of a New England combination group/individual purchase?"  He also indicated that his employer, identified as Advantage, would pay for the coverage in its entirety, and that this contribution would not be included in his taxable income.  In the application, Davis named himself as both the insured and the owner with respect to the desired policy, and requested that all notices be sent to his residential address.  Finally, the application cautions, "[i]f this application is being used to request Group coverage, then it is also understood and agreed [that] Group insurance applied for will not be in force until this application and the Group plan are approved by The New England."

A few weeks later, Rocco suggested to Davis and his wife that if Fidler wanted to purchase a disability insurance policy,

---

[1]New England Mutual Life ("The New England") later merged with MetLife, one of the defendants in this action.

Advantage could raise her pay to cover the amount of the premium. The premium payments would be reported as Fidler's income. Rocco explained that this arrangement would allow Advantage to confer an additional benefit on Fidler at a relatively low cost. He then met separately with Fidler, who elected to fill out an application for disability insurance with The New England on March 31, 1995, using the same form that Davis had used. Like Davis, Fidler indicated on the application that the policy would not be part of a combination group/individual purchase and that Advantage would pay for the coverage in its entirety. Unlike Davis, however, she stated that Advantage's contribution would be included in her taxable income, and asked for notices to be sent to her employer's address. Davis's wife talked to Rocco about procuring her own disability insurance policy, but they ultimately concluded that she did not earn enough to justify it.

The New England issued a disability insurance policy to Davis on April 1, 1995. There is no evidence suggesting that The New England evaluated or approved any group plan before extending this coverage to Davis. The policy identifies itself as a "preferred professional disability income policy" and Davis as both its insured and its owner. The policy does not condition its payment of benefits on Davis's continued employment with Advantage. Although the policy lists a "total annual premium" of

3

$1,454, it also lists a "select 20 annual premium" of $1,163.20 and states that Davis "ha[s] a select premium as indicated."

The parties dispute the significance of this apparent twenty percent reduction in the premium. The defendants characterize it as a "multi-life discount," which MetLife explained in its deposition given pursuant to Fed. R. Civ. P. 30(b)(6) as a reduction available to an employer purchasing multiple policies at the same time.[2] The defendants therefore suggest that the discount resulted from Advantage's simultaneous purchase of Davis's and Fidler's disability policies.

MetLife's Rule 30(b)(6) deponent also stated, however, that she did not know why Davis received the discount, and that the issuance of policies on just three different lives ordinarily would not trigger the multi-life discount.[3] Furthermore, Davis points out that he received the discount immediately upon the issuance of his disability policy on April 1, 1995, even though

---

[2]MetLife also relies on a document entitled "ESP/PAC Employee Security Transmittal," listing the "employer's name" as Advantage and identifying Davis, his wife, and Fidler as "applicants." According to MetLife's Rule 30(b)(6) deponent, the document indicates "that there were three employees of Advantage, Inc., who were issued policies that were being billed together through the employer." It is undisputed, however, that only two Advantage employees, Davis and Fidler, sought disability insurance through The New England.

[3]Again, The New England issued disability insurance to just two Advantage employees.

4

Fidler's application was not received until April 3, 1995.[4] Rocco attests that "he provided no pricing premiums [to Davis] which would reflect a group policy or an employee benefit plan of any type." Accordingly, a factual dispute exists as to whether the discount Davis received was of the multi-life variety.[5]

The premiums for both Davis's and Fidler's disability insurance were paid out of Advantage's corporate bank account, which is used for business expenses and maintained separately from the Davises' personal accounts. Advantage reported the premiums as regular business expenses on its tax returns. Although Davis's accountant had wanted him to pay the premiums on his disability policy with his own earnings in order to avoid tax liability on any benefits, the accountant did not communicate this to Davis until January 2002, at which point he began paying the premiums out of his personal account. Fidler did not report Advantage's payment of the premiums for her disability insurance as taxable income until 2003, despite the stated intention to the

---

[4]Davis suggests that he received the discount because he already had a life insurance policy with The New England at the time he applied for disability insurance. Both Davis and his wife had applied for split-dollar life insurance policies with The New England on March 6, 1995. Advantage pays the premiums.

[5]Neither party points to any evidence indicating whether The New England provided a discount on the premiums for Fidler's disability policy. Fidler's policy itself does not appear in the summary judgment record.

5

contrary in her application for the policy.

On June 10, 2002, Davis filled out a form to claim disability benefits from The New England, stating that "shoulder disability and pain make it impossible for me to perform my job as a graphic artist." The New England paid benefits to Davis in August 2002 to cover his disability from May 1, 2002, through August 1, 2002, but subsequently notified Davis of its denial of his claim for further benefits. Davis appealed this decision through his attorney. The New England later informed Davis's lawyer that his appeal had been denied, explained the basis for the denial, and related that Davis had the right to bring suit under ERISA if he disagreed.

Davis then brought an action in Merrimack County Superior Court against MetLife, as well as Unum, the agent who had handled his disability claim on behalf of The New England. The action sought a declaratory judgment that Davis was entitled to benefits under the disability policy. In a separate filing in the same court, Davis sued the same defendants for breach of contract, bad faith breach of contract, and "tortuous [*sic*] denial of claim." The defendants removed both cases to this court on the grounds that the claims arose out of ERISA, presenting a federal question, and that diversity jurisdiction also existed.

6

## Standard of Review

On a motion for summary judgment, the moving party has the burden of showing the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant does so, the court must then determine whether the non-moving party has demonstrated a triable issue.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  In performing this analysis, the court must view the entire record in the light most favorable to the non-movant, "'indulging all reasonable inferences in that party's favor.'"  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).

## Discussion

The outcome of the defendants' summary judgment motion turns on whether Davis's disability insurance policy is part of an "employee benefit plan" within the meaning of ERISA, because the statute pre-empts state laws only "insofar as they . . . relate to any employee benefit plan . . . ."[6]  29 U.S.C. § 1144(a).  In relevant part, ERISA defines "employee welfare benefit plan" as

---

[6]Davis does not dispute that his state-law claims "relate to" an employee benefit plan, if one exists.

> any plan, fund, or program . . . established or
> maintained by an employer . . . to the extent that such
> plan, fund, or program was established or is maintained
> for the purpose of providing for its participants or
> their beneficiaries, through the purchase of insurance
> or otherwise, . . . benefits in the event of sickness,
> accident, disability, death, or unemployment . . . .

Id. § 1002(1). Criticizing this definition as "nearly tautological," the First Circuit has indicated that any inquiry into the existence of an ERISA plan should be informed by the purposes of the statutory scheme. Demars v. Cigna Corp., 173 F.3d 443, 445-46 (1st Cir. 1999); see also O'Connor v. Commonwealth Gas Co., 251 F.3d 262, 266 (1st Cir. 2001).

In Fort Halifax Packing Co. v. Coyne, the Supreme Court elucidated these goals as ensuring a uniform federal standard for the administration of employee benefit plans and safeguarding those plans from employer abuse. 482 U.S. 1, 12-16 (1987). The Court also recognized that an employee benefit arrangement does not implicate these concerns absent "benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." Id. at 11; see also District of Columbia v. Greater Wash. Bd. of Trade, 506 U.S. 125, 130 n.2 (1992).

Accordingly, the First Circuit has stated its "inclin[ation] to find a plan where there are elements that involve administrative activity potentially subject to employer abuse." New England Mut. Life Ins. Co. v. Baig, 166 F.3d 1, 4 (1st Cir.

1999) (internal quotation omitted); see also Simas v. Quaker Fabric Corp. of Fall River, 6 F.3d 849, 854 (1st Cir. 1993) ("Fort Halifax prescribes a definition based on the extent and complexity of administrative obligations . . . ."). The court cannot consult any "authoritative checklist" to determine whether the employer's obligations with respect to the benefits in question suffice to create an ERISA plan. Belanger v. Wyman-Gordon Co., 71 F.3d 451, 455 (1st Cir. 1995). Instead, the existence of an ERISA plan poses "a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person." Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1082 (1st Cir. 1990) (internal quotation marks omitted); Belanger, 71 F.3d at 455 ("One very important consideration is whether, in light of all the surrounding facts and circumstances, a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits.")

As the parties invoking ERISA pre-emption, the defendants bear the burden of proving that Davis's disability insurance is part of an employee benefit plan. See Zavora v. Paul Revere Life Ins. Co., 145 F.3d 1118, 1120 n.2 (9th Cir. 1998); Settles v. Golden Rule Ins. Co., 927 F.2d 505, 508 (10th Cir. 1991). The defendants assert that a plan exists based on Advantage's payment

9

of the premiums on the disability policies issued to Davis and Fidler, in addition to the life insurance premiums for Davis and his wife and health insurance premiums for all three employees.

In making this argument, the defendants rely heavily on cases from other circuits for the principle that "an employer's payment of insurance premiums <u>alone</u> offers 'substantial evidence' of a plan." Reply Mem. Supp. Defs.' Mot. Summ. J. at 4. <u>See</u>, <u>e.g.</u>, <u>Sipma v. Mass. Cas. Co.</u>, 256 F.3d 1006, 1012 (10th Cir. 2001) (quoting <u>Gaylor v. John Hancock Mut. Life Ins. Co.</u>, 112 F.3d 460, 464 (10th Cir. 1997); <u>Robinson v. Linomaz</u>, 58 F.3d 365, 368 (8th Cir. 1995) (collecting cases); <u>Kidder v. H & B Marine, Inc.</u>, 932 F.2d 347, 353 (5th Cir. 1991) (quoting <u>Donovan v. Dillingham</u>, 688 F.2d 1367, 1373 (11th Cir. 1982) (en banc)). The First Circuit, however, has placed less significance on an employer's purchase of insurance per se, focusing instead on whether the purchase "constituted an expressed intention by the employer to provide benefits on a regular and long term basis." <u>Wickman</u>, 908 F.2d at 1083. Furthermore, even "[w]here there is such a purchase, evidence demonstrating the express intention of an employer to provide continuing benefits, is among those 'factors [which] tend to be more indicative of the existence of a plan than others,'" rather than irrefutable proof of such an arrangement. <u>New England</u>, 166 F.3d at 5 (quoting <u>Belanger</u>, 71

10

F.3d at 455).

There is no dispute that Advantage paid the premiums on the disability insurance policies issued to Davis and Fidler, at least until Davis began paying for his coverage out of a personal checking account in January 2002. The rest of Advantage's actions, however, leave substantial doubt as to whether these payments were intended to bestow continuing benefits. The company did not enter into any agreement with either Davis or Fidler which committed it to provide disability insurance. Cf. Donovan, 688 F.2d at 1374-75. Nor did either disability policy "bear any relationship to the [insured's] employment" at Advantage; the coverage "would have continued in effect as long as [someone] continued to pay the premiums, regardless of any changes in [Davis's or Fidler's] employment situation." New England, 166 F.3d at 5 (citing this arrangement as mitigating against existence of ERISA plan).

Also like the insurance at issue in New England, the disability policies issued to Davis and Fidler were not established by a contractual arrangement between Advantage and The New England, but between each insured and the insurer. Id. at 4; cf. Postma v. Paul Revere Life Ins. Co., 223 F.3d 533, 537 (7th Cir. 2000) ("An employer establishes or maintains a plan if it enters a contract with the insurer and pays its employees'

11

premiums.") (emphasis added).

Furthermore, as made clear by the applications submitted by Davis and Fidler, and by The New England's never undertaking the approval process necessary to initiate coverage as part of a group plan, each insured received his or her own individual policy.[7] Faced with similar circumstances in New England, the First Circuit concluded that an employee's individual disability policy was not part of an ERISA plan. 166 F.3d at 4. Indeed, the court in New England distinguished a number of cases from other circuits finding that an employee welfare benefit plan arose from the employer's purchase of insurance for its employees because they involved either "a direct contractual arrangement between the insurer and the employer establishing the policy in question" or "group coverage." Id. at 4 n.2. Those elements are also absent from the insurance at issue in this case.[8]

Despite these similarities, the defendants attempt to

_____

[7]The defendants do not rely on the asserted "multi-life discount" as evidence of a group policy. Accordingly, the factual dispute as to the significance of the reduced premium on Davis's disability policy discussed supra does not impact the court's conclusion that there was no group coverage.

[8]The court in New England also distinguished these cases on a third ground which does exist here, namely the "direct payments of premiums by the employer to the insurer, with the payments . . . made out of employer funds." 166 F.3d at 4 n. 2. The First Circuit's accompanying review of those cases, however, reveals that none involved this factor alone. Id.

distinguish <u>New England</u> as exempting an employee's insurance policy from ERISA only when "the employer's involvement is limited to after the fact reimbursement of premiums paid in the first instance <u>directly by the employee</u>."  Reply Mem. Supp. Defs.' Mot. Summ.  J. at 4.  This reading is too narrow.  The <u>New England</u> court specifically stated that "[e]ven where an employer actually purchases an insurance policy, or makes payments directly, there may not be a 'plan' for ERISA purposes."[9]  166 F.3d at 4-5 (footnotes omitted).  Instead, the overriding consideration in determining the existence of an ERISA plan is the employer's "chance for abuse, carelessness or misappropriation of funds of the sort that might escape [the employee's] oversight."  <u>Id.</u> at 5.  <u>New England</u> simply recognizes that an employer's mere reimbursement of its employees' insurance

---

[9]This passage follows the First Circuit's quotation from the district court opinion in <u>New England</u> on which the defendants also rely, <u>i.e.</u>, "'[w]hen an employer deals directly with the insurer and actually purchases an insurance policy for an employee, there may be sufficient participation to meet the "established or maintained" requirement under ERISA.'"  166 F.3d at 4 (quoting 985 F. Supp. 11, 14 (D. Mass. 1997)).  Thus, rather than endorsing a hard and fast rule that an employer's dealing directly with an insurer gives rise to an ERISA plan, as the defendants would have it, <u>New England</u> simply recognizes such direct dealing as a factor pointing toward that conclusion.  In any event, beyond Advantage's remission of premium payments, the employer did not "deal directly" with the insurer in this case. Advantage was not involved in the submission of either Davis's or Fidler's application, or Davis's pursuit of his claim.

13

premiums does not present such an opportunity.  The case does not suggest that any further level of employer involvement automatically implicates the concerns behind ERISA.

The defendants also attach great significance to the difference between actually paying an employee's insurance premiums, as in this case, and reimbursing employees for their own payment of those costs, as in New England.[10]  They argue that the former course requires the employer "to keep its corporate account funded in order to make the premium payments, to make accounting adjustments in light of those payments, and to properly allocate the payments on its tax return."  Reply Mem. Supp. Defs.' Mot. Summ.  J. at 5.

Advantage, however, had no obligation either to Davis or The

---

[10]Counsel for the defendants skirts the limits of permissible advocacy with their claim that the court in New England "specifically recognized [this] crucial distinction . . . [because] the first scenario involves 'periodic demands on [employer] assets . . . creat[ing] a need for financial coordination and control' while the second does not."  Reply Mem. Supp. Defs.' Mot. Summ. J. at 4-5.  As explained, supra, this is a misreading of New England.  It approaches a misrepresentation because the court made no such distinction, specifically or otherwise, and because the quoted language actually comes from the court's own quotation of Fort Halifax in setting forth the test for determining the existence of an ERISA plan.  Nowhere does the court so much as intimate that an employer's payment of premiums for an employee's insurance coverage would automatically satisfy this test; in fact, as this court has already noted, the opinion expressly states otherwise.

New England to pay the premiums for his disability insurance. Part 4.1 of the policy itself identifies Davis, as the insured, as the source of premium payments, and other provisions of the policy require Davis to apply for reinstatement in case his coverage lapses due to non-payment and to submit his own written claims and proofs of loss. Furthermore, in the event that The New England did not receive a payment due under the policy, Davis would have learned of the fact personally and had the opportunity to respond, because he asked to receive all notices sent in connection with the policy at his residential address.

In contrast, the policy does not even refer to Advantage, much less saddle it with any contractual duties. This arrangement therefore presented Advantage with "little chance for abuse, carelessness or misappropriation of funds of the sort that might escape [Davis's] oversight or threaten his benefits." New England, 166 F.3d at 5. Similarly, although Advantage certainly faced "administrative obligations" with regard to the accounting and tax treatment of the costs of its employees' insurance, shirking these responsibilities (e.g., by overstating the costs in deducting them as business expenses) would not have "threatened" anyone's insurance coverage. Advantage's gratuitous payment of its employees' insurance did not "involve[] the kind of ongoing discretionary judgments that would sufficiently tax an

15

employer's administrative integrity to warrant ERISA's prophylaxis." O'Connor, 251 F.3d at 270-71.

Indeed, it is the lack of discretion attendant to Advantage's involvement in procuring insurance for its employees that distinguishes this case from Wickman, on which the defendants also rely. The employer in that case "provided a comprehensive insurance program" consisting of several different types of insurance, distributed a handbook containing a summary plan description, and "contemplated and devised specific insurance eligibility requirements." 908 F.2d at 1083. The First Circuit held that such a "degree of planning, precision, and detail . . . represented [the employer's] calculated commitment to qualified employees for similar benefits regularly in the future." Id.

The employer's actions in this case do not permit the same inference. Indeed, while Advantage purchased health insurance for all of its employees, it bought life insurance for only Davis and his wife, and disability insurance only for Davis and Fidler. Advantage's decisions on whom to insure against what comprised a series of ad hoc choices driven almost exclusively by the wishes of the employee in question, rather than arising from "specific eligibility requirements." As the First Circuit noted in a subsequent discussion of Wickman, such requirements are

16

"precisely the kind of discretionary criteria that trigger an employer's fiduciary obligation to its employee-beneficiaries." O'Connor, 251 F.3d at 272. That Advantage bestowed benefits without regard to any identifiable criteria suggests the absence of the "calculated commitment to qualified employees for similar benefits regularly in the future," Wickman, 908 F.2d at 1083, which creates a need for the protections of ERISA.[11]

The defendants argue further that O'Connor "distinguished" New England on the basis of the difference between an employer's direct payment of premiums on its employees' insurance policies and its reimbursement of its employees for making those payments themselves. Reply Mem. Supp. Defs.' Mot. Summ. J. at 5. This characterization rests on what the defendants call O'Connor's "holding that an employer's payment of COBRA premiums directly to the insurer was subject to ERISA despite the fact that the employer's only role was to 'write a series of checks over a year.'" Id. Although the First Circuit in O'Connor concluded that the district court erred in relying on New England to find

_____

[11]Advantage's individualized decisions on employee insurance also demonstrate that it did not "'purchase . . . multiple policies covering a class of employees,'" an act which Wickman characterized as "'substantial evidence that a plan, fund, or program has been established'" in a passage on which the defendants place particular emphasis. 908 F.2d at 1083 (quoting Donovan, 688 F.2d at 1373).

17

that the employer's payment of its employees' COBRA premiums did not implicate ERISA, it based this conclusion on the fact that "the COBRA benefit was for <u>a group insurance plan sponsored by [the employer]</u>, which paid the premium."  251 F.3d at 270 (emphasis added).  Thus, just as in <u>New England</u> and <u>Wickman</u>, the existence of an employee welfare benefit plan in <u>O'Connor</u> depended on more than merely whether the employer paid its employees' premiums.  Because Advantage merely paid the premiums for its employees' individual policies, <u>O'Connor</u>'s determination that the payment of the premiums on an employee-sponsored group insurance plan "probably falls within ERISA's protections" does not control the outcome here.  251 F.3d at 270.

<u>O'Connor</u> does teach, however, that the First Circuit's "precedents addressing benefits similar to those in [the case at hand] are particularly instructive" in making such determinations, which "are not clear cut and necessarily require line drawing."  <u>Id.</u> at 267; <u>see also</u> <u>Simas</u>, 6 F.3d at 853; <u>Belanger</u>, 71 F.3d at 454.  In light of the foregoing examination of <u>Wickman</u>, <u>New England</u>, and <u>O'Connor</u>, each of which considered whether an employer's purchase of employee insurance under certain circumstances triggered ERISA, Advantage's payment of the premiums on the various insurance policies issued to its

18

employees did not create an employee welfare benefit plan.[12]  In sum, "the plan at issue, viewed as a whole, [does not] require the exercise of discretion to the degree that would justify

---

[12]The defendants also cite a raft of extrajurisdictional authorities assertedly holding that an employer's purchase of insurance for its employees can give rise to an ERISA plan.  Many of these cases were distinguished by the First Circuit in New England.  166 F.3d at 4 n.3.  Most of the rest are distinguishable on similar grounds.  See Libbey-Owens-Ford Co v. Blue Cross & Blue Shield Mut. of Ohio, 982 F.2d 1031, 1034  (6th Cir. 1993) (employer contracted with insurer for group coverage); Int'l Resources, Inc. v. N.Y. Life Ins. Co., 950 F.2d 294, 298 (6th Cir. 1991) (employer contracted for group coverage through multi-employer trust); Kidder, 932 F.2d at 353 ("this case does not involve . . . a single employee who is essentially purchasing insurance for himself while attempting to characterize his insurance as a group health plan"); Reber v. Provident Life & Accident Ins. Co., 93 F. Supp. 2d 995, 1005-1006 (S.D. Ind. 2000) (distinguishing New England because employer, unlike in New England, "established a contractual relationship" with insurer).  The remaining reported cases appear to have relied on evidence of the employer's intent to provide ongoing benefits beyond the mere payment of premiums.  See Sipma, 256 F.3d at 1013 ("The corporation took action to provide disability insurance on a regular and long-term basis . . . and paid the premiums for the insurance") (emphasis added); Stone v. Disability Mgmt. Servs., 288 F. Supp. 2d 684, 689-90 (M.D. Pa. 2003) (discerning employer's "long term commitment to ensuring that . . . officers were covered by disability insurance," based in part on fact that every shareholder was issued disability insurance).  Although the two unreported decisions on which the defendants rely found ERISA plans to exist based on facts similar to those presented here, this court considers their analyses of the issue cursory and uninformed by the First Circuit's command to consider whether the benefit scheme at issue implicates the concerns behind ERISA. See Brown v. Paul Revere Life Ins. Co., 2002 WL 1019021, at *5-*6 (E.D. Pa. May 20, 2002); Giustra v. UNUM Life Ins. Co. of Am., No. 00-748 (Me. Super. Ct. Mar. 4, 2002), slip op. at 6, aff'd, 815 A.2d 811 (Me. 2003).

saddling an employer with fiduciary responsibility and foreclosing an employee's state claims." <u>O'Connor</u>, 251 F.3d at 271. The court therefore need not reach the other arguments that Davis advances against the application of ERISA.

<u>Conclusion</u>

For the foregoing reasons, the defendants' motion for summary judgment on Davis's state-law claims based on ERISA pre-emption (document no. 17) is DENIED.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

September 13, 2004

cc:  Byrne J. Decker, Esquire
     Jeffrey B. Osburn, Esquire