DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**GRAND HARBOR GOLF & BEACH CLUB, INC.,**
Appellant,

v.

**GRAND HARBOR GOLF CLUB, LLC,** et al.,
Appellees.

No. 4D2023-1378

[November 27, 2024]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Indian River County; Janet C. Croom, Judge; L.T. Case No. 312021CA000308.

Joseph T. Eagleton, Steven L. Brannock, and Ceci C. Berman of Brannock Berman & Seider, Tampa, and Dane R. Ullian of Gould Cooksey Fennell, Vero Beach, for appellant.

Jason R. Domark of Cozen O'Connor, Miami, Matthew B. Criscuolo of Cozen O'Connor, West Palm Beach, and Herbert Beigel of Law Offices of Herbert Beigel, Tuscon, Arizona, for appellees.

GROSS, J.

This is an appeal from a summary judgment in a contract dispute involving Grand Harbor Golf & Beach Club, Inc. (the "Club"), a country club located in Indian River County, Florida, and Grand Harbor Golf Club, LLC (the "LLC") the successor in interest to the original developer. Established in the 1990s, the Club includes homes and condominiums, two private 18-hole golf courses, a clubhouse, a tennis complex, a pool complex, and an oceanfront beach club.

The main question presented in this appeal is whether the contractual duty to maintain the property "in good working order, ordinary wear and tear excepted," includes an obligation to replace assets that have aged beyond their useful life, so they can no longer be repaired.

To the extent the final judgment holds that the LLC is not responsible to replace physical assets that have reached the end of their useful life, we

affirm. To the extent the final judgment holds that the developer is not responsible to repair assets to place them in good working order, ordinary wear and tear excepted, we reverse and remand for further proceedings.

### *The Agreement to Sell*

In 1992, the Club executed an Agreement to Sell with the original developer. Under the Agreement to Sell, the developer agreed to convey and transfer the club facilities to the Club at a future turnover date. The Agreement to Sell defined a "turnover date" as being sixty days after either (1) the initial sale of all equity memberships permitted to be issued in the Club or (2) at an earlier date determined by the developer, provided that the Club operated without a deficit for the immediately preceding twelve-month period.

Before the turnover, the Club retained for its members the full right to use and enjoy the Club facilities. The developer held legal title to the property and exercised exclusive control over the Club's management, finances, and operations. The developer collected payments from the sale of new equity memberships, collected all dues and other revenue of the Club, and was entitled to retain the Club's operating profits.[1]

In exchange, the Agreement to Sell placed three significant pre-turnover duties on the developer: (1) to fund any Club operating deficits; (2) to operate the Club facilities "in a manner comparable to other similar country club facilities in the State of Florida"; and (3) to maintain the Club facilities "in good working order, ordinary wear and tear excepted."

Additionally, the Agreement to Sell required expert inspections within three months of the agreement's execution "to confirm that the existing Club Facilities are in good working order, taking into account the age and use of the facilities." The Agreement to Sell required the developer, at "its sole cost and expense," to "make the necessary repairs indicated in the inspection reports."

---

[1] Section 16 of the Agreement to Sell provided in part:

> Until the turnover date, the [developer] shall be responsible for operating the Club Facilities and the Club shall pay to the [developer] all of the dues and charges incurred by its members for the use of the Club Facilities. The [developer] shall be responsible for any cash deficits incurred in the operation of the Club Facilities, and will be entitled to retain the operating cash profits, if any, prior to the Turnover Date.

On the turnover date, the Club agreed to accept the Club facilities in their "where is, as is" condition, without warranties, subject only to the initial inspections and repairs. Section 9 of the Agreement to Sell stated:

> THE CLUB HEREBY ACCEPTS THE CLUB FACILITIES TO BE TRANSFERRED ON THE TURNOVER DATE IN THEIR "WHERE IS, AS IS," CONDITION, SUBJECT TO THE INSPECTIONS AND REPAIRS MADE PURSUANT TO SECTION 5 ABOVE, WITHOUT RECOURSE, AND THE PARTNERSHIP DISCLAIMS AND MAKES NO REPRESENTATION OR WARRANTIES EXPRESS OR IMPLIED . . . .

### *Succession by the LLC and Operations under New Ownership*

In 2004, the LLC became the successor in interest to the original developer. The LLC assumed all the developer's obligations under the Agreement to Sell and operated the Club from 2004 until 2020.

By 2020, the club facilities were about thirty years old, and the Club retained consultants to assess their condition. Consultant reports indicated that certain assets were beyond their useful lives and required replacement or renovation, including the golf courses, irrigation systems, boardwalk, and cabana deck.

For example, the United States Golf Association noted that "the golf course drainage is very old," "the irrigation is in need of replacement," "fairways and roughs could benefit from renovations," bunkers were "old" and "could benefit greatly from a renovation," and "a renovation of both courses is overdue." Similarly, another report noted that much of the golf infrastructure was "original to the construction of the course and ha[d] exceeded the anticipated life expectancy," adding that the largest planned "capital replacements" included "new irrigation systems for both courses, a new pump station for the River course, bunker renovations on both courses, replacement of greens surfaces on both courses, and replacement of all bridges."

The Club's corporate representative conceded that no amount of maintenance would have prevented the golf courses from becoming obsolete by the time of turnover:

> The Club's position is that the useful life of the golf courses would have been reached some time ago regardless of the extent of maintenance . . . [N]o amount of maintenance, the

Club believes, would have resulted in the golf courses not being obsolete at the time of . . . turnover.

When asked to identify any assets whose useful life was shortened by improper maintenance, he testified: "I never said the useful life was shortened by improper maintenance."

### *The Omnibus Agreement Regarding Turnover*

In 2020, a dispute arose as to whether the LLC was required to pay for all of the Club's desired repairs and renovations, which were projected to cost in excess of $11 million. The LLC proposed an early turnover as an alternative to bankruptcy.

In the face of this dispute, in late 2020, the Club and the LLC entered into a Second Omnibus Agreement (the "Omnibus Agreement") in which the parties "agreed to implement turnover of control of the Club to the Equity Members and transfer of the Club Facilities to the Club." As part of the Omnibus Agreement, the LLC transferred to the Club all of its unsold equity memberships, which had a face value of over $28 million. The Omnibus Agreement included a section entitled "Reservation of Rights and Claims; No Release," in which the Club expressly reserved the right to assert the types of claims it brought in the underlying lawsuit.

In addition, the Omnibus Agreement provided that the Agreement to Sell's "where is, as is" provision survived the turnover.

### *This Lawsuit*

Following the turnover, the Club brought this lawsuit against the LLC and various affiliated defendants, asserting multiple counts for breach of contract and breach of fiduciary duty. Count I asserted a claim for breach of the Agreement to Sell, alleging that the LLC and affiliated entities breached their obligations by failing to maintain the Club facilities in "good working order, ordinary wear and tear excepted," and failing to "operate the Club Facilities . . . in a manner comparable to other similar country club facilities in the State of Florida." Counts II through XVI asserted claims for breach of fiduciary duty against the various defendants, alleging that the defendants allowed the Club facilities to deteriorate and mismanaged the finances of the Club. Count XVII was a claim for specific performance of the Omnibus Agreement related to the failure to transfer certain property to the Club.

### The Parties' Motions for Summary Judgment

The Club moved for partial summary judgment, arguing that the LLC's duty to maintain the Club in "good working order, ordinary wear and tear excepted," included an obligation to "perform capital replacement" of any asset that was beyond its useful life and could not "be corrected by ordinary maintenance."

The LLC responded to the Club's motion and filed its own summary judgment motion, arguing in its various filings that (1) the Agreement to Sell's duty to maintain did not encompass a duty to pay for capital replacements, and (2) the "where is, as is" provision barred the Club's claims related to the condition of the facilities.

### The Trial Court Grants the Defendants' Motion for Summary Judgment and Enters Final Judgment

After extensive briefing and a hearing, the trial court granted the defendants' motion for summary judgment as to Count I for breach of the Agreement to Sell. The court ruled that the governing documents (including the Agreement to Sell) did not create a legal duty for the LLC to pay for capital expenses or to replace assets that could no longer be repaired. The court pointed out that "there is no provision anywhere in the Governing Documents that imposes a requirement on [the LLC] to pay for capital repairs/replacements." The court reasoned that the LLC was responsible only for paying the Club's operating expenses, which encompassed "maintenance expenditures, not capital expenditures."

The court further concluded that the "where is, as is" provision survived the Omnibus Agreement and barred the Club's claims related to the condition of the club facilities as a matter of law. The court found that the reservation of rights in the Omnibus Agreement "did not create new claims related to the condition of the club facilities; it only reserved claims if they already existed." The Club "had no such claims under the governing documents," the court reasoned, "because they are barred by the surviving 'where is, as is' provision." The order granting summary judgment effectively disposed of Count I.

On the first day of trial, the parties discussed the implications of the summary judgment order on the remaining claims. The Club conceded that, based on the trial court's rulings, the proper procedure would be for the court to enter summary judgment for the defendants on all the Club's claims (other than Count XVII) because "an essential element of every count, 1 through 16, either as the liability theory or as the damages theory,

is the condition of the Club facilities." Accordingly, following some procedural formalities, the court entered a final judgment in favor of the defendants on Counts I through XVI and in favor of the Club on Count XVII.

### *The LLC's Obligation to "Maintain" Club Facilities "in Good Working Order, Ordinary Wear and Tear Excepted" Did Not Include the Duty to Replace an Asset that had Aged Beyond its Useful Life*

"Courts are required to construe a contract as a whole and give effect, where possible, to every provision of the agreement." *Colombo v. Robertson, Anschutz & Schneid, P.L.*, 341 So. 3d 1126, 1128 (Fla. 4th DCA 2022) (citation omitted). "When the language of a contract is unambiguous, it must be enforced based on its plain language." *Custom Marine Sales, Inc. v. Boywic Farms, Ltd.*, 245 So. 3d 791, 792 (Fla. 4th DCA 2018). "The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." *Advisory Op. to Governor re Impl. of Amend. 4*, 288 So. 3d 1070, 1078 (Fla. 2020) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012)).

The term "maintain" is defined as "[t]o care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." *Maintain, Black's Law Dictionary* (11th ed. 2019). The "ordinary wear and tear" exception from the maintenance requirement excludes "the loss, injury, or stress to which [the property] is subjected by or in the course of use." *Superhost Hotels, Inc. v. Selective Ins. Co. of Am.*, 75 N.Y.S.3d 124, 126 (N.Y. App. Div. 2018).

In the landlord-tenant context, "[t]he exception of 'ordinary wear and tear' merely relieves the lessee of any duty to the landlord to maintain the leasehold in a 'like-new' condition." *Rizzo v. Naranja Lakes Condo. Assoc.*, 498 So. 2d 451, 452 (Fla. 3d DCA 1986). A party obligated to maintain property in good working order, ordinary wear and tear excepted, is merely required to keep the subject property "serviceable and in good repair." *Capitol Funds, Inc. v. Arlen Realty, Inc.*, 755 F.2d 1544, 1549 (11th Cir. 1985); *see also Younker v. Inv. Realty, Inc.*, 461 S.W.3d 1, 9 (Mo. Ct. App. 2015) (discussing, in the landlord-tenant context, the ordinary meaning of "ordinary wear and tear").

We agree with those courts concluding that a maintenance obligation similar to the one in this case did not include the duty to replace assets beyond their useful life. *See Polo/W. Hartford, LLC v. Loring Realty*

*Advisors, VII, LLC*, No. CVH-7662, 2009 WL 1299099, at *9 (Conn. Super. Ct. May 4, 2009) (holding that a tenant's obligation to share the cost of "maintenance" of a parking area did not include the "cost of replacing or reconstructing it"); *Twp. of Lower Yoder v. Borough of Westmont*, No. 932 C.D. 2016, 2017 WL 2350448, at *1, *4 (Pa. Commw. Ct. May 31, 2017) (holding that a maintenance obligation for sewer lines did not require "wholesale replacement of the existing system").

The ordinary meaning of "maintain" does not encompass replacement or reconstruction of physical assets. "Maintain" is commonly understood to involve general repair and upkeep necessary to keep property operational for its intended use. The Agreement to Sell did not expressly hold the LLC/developer liable for all depreciation—that is, "the loss [] not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence." *Lindheimer v. Ill. Bell Tel. Co.*, 292 U.S. 151, 167 (1934) (defining "depreciation"); *cf. Bldg. Serv. Loc. 32B-J Pension Fund v. 101 Ltd. P'ship*, 51 N.Y.S.3d 31, 33 (N.Y. App. Div. 2017) (where lease required keeping leased premises in "good and safe order and working condition" whether "necessitated by wear and tear, obsolescence or defects, latent or otherwise").

This interpretation of the Agreement to Sell's obligation to maintain is consistent with the way the agreement treats capital improvements. The Agreement to Sell draws a distinction between "capital improvements or repairs" and "operating" deficits and profits. The LLC was responsible for "operating" expenses, which would generally include maintenance costs but not capital expenditures for replacements or renovations. In other words, operating expenses encompass annual costs necessary for the property to function, whereas capital expenditures relate to improvements or replacements. The trial court correctly recognized that requiring the LLC to fund capital expenditures would read the term "operating" out of the agreement.

The Club also argues that the LLC's maintenance obligation was "heightened" by its obligation to "operate" the club in a manner comparable to other clubs. But the cited provision deals only with "operations," not maintenance of physical assets.

Our view of the scope of the Agreement to Sell's obligation to maintain is consistent with the "where is, as is clause" in the agreement. An "as is" clause in a contract generally bars claims related to the condition of the property at the time of transfer. *See Belle Plaza Condo. Ass'n v. B.C.E. Dev., Inc.*, 543 So. 2d 239, 240 (Fla. 3d DCA 1989) (holding that claims

7

related to the condition of the condominium at turnover were barred by the governing documents' disclaimer that the property was being sold "as is"); *Coble v. Lekanidis*, 372 So. 2d 506, 507–09 (Fla. 1st DCA 1979) (holding that an "as is" provision was a valid defense to allegations that the defendant did not "adequately maintain[] the buildings and equipment included in the sale"). The "where is, as is" clause contemplated that, at turnover, some property conditions might need amelioration that would fall outside the scope of the LLC's obligation to maintain the property.[2]

Finally, we focus on the Agreement to Sell's words instead of importing a blanket rule from landlord-tenant cases. The relationship between the LLC and the Club is different from that of a landlord and tenant, where the lessee "holds an outstanding leasehold estate" in the leased premises "which for all practical purposes is equivalent to absolute ownership." *Rogers v. Martin*, 99 So. 551, 552 (Fla. 1924). The lessor's interest in the leased property "is limited to his reversionary interest which ripens into perfect title at the expiration of the lease." *Id.* Here, both the Club and the LLC occupied the property—the latter to operate the club and maintain its property for Club members' use and enjoyment. The common law presumption—that a "lessee, not the lessor, has the duty to make repairs of any kind to the demised premises in the absence of a specific undertaking to the contrary"—should not override the language of the Agreement to Sell. *Rizzo*, 498 So. 2d at 452 (stating the common law rule).

### *Issues of Fact Remain as to Whether Certain Conditions of the Property Fell under the LLC's Obligation to Maintain the Property*

The consulting reports commissioned by the Club identified deficiencies in certain club assets. For example, one report noted that "the green surfaces have experienced decline because of poor agronomic conditions." Taking the evidence in the light most favorable to the Club, we conclude that some repairs could fall within the LLC's maintenance obligation. We note that the LLC would have the burden at trial of proving what portion, if any, of the damage and cost of restoration resulted from normal wear and tear so that it was not recoverable by the Club. *See Stegeman v. Burger Chef Sys., Inc.*, 374 So. 2d 1130, 1131 (Fla. 1st DCA 1979). We therefore reverse in part and remand for the Club to assert its claims based

---

[2] However, we conclude that the specific reservation of rights in the Agreement to Sell controls over the "where is, as is" clause for any pre-turnover claims that the LLC failed to meet its basic obligation to maintain assets in good working order, ordinary wear and tear excepted.

on the LLC's obligation to maintain the property in good working order, ordinary wear and tear excepted.

*Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.*

WARNER and CIKLIN, JJ., concur.

\*       \*       \*

**Not final until disposition of timely filed motion for rehearing.**

9